UNITED STATES of America, Plaintiff–
Appellee–Cross–Appellant,

v.

Harvey N. SHENBERG, Defendant–
Appellant–Cross–Appellee,

David Goodhart, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Harvey N. SHENBERG, Alfonso C.
Sepe, Defendants–Appellees.

Nos. 93–4798, 93–4906.

United States Court of Appeals,
Eleventh Circuit.

July 12, 1996.

G. Richard Strafer, Quinon & Strafer, P.A., Miami, FL, for Shenberg in No. 93–4798.

James Jay Hogan, Miami, FL, for Goodhart in No. 93–4798.

William A. Keefer, Jr., U.S. Attorney, John O'Sullivan, Anne Ruth Schultz, Linda Collins Hertz, Lawrence D. Levecchio, Dennis R. Bedard, Asst. U.S. Attys., Miami, FL, for the U.S. in No. 93–4798.

Anne R. Schultz, Asst. U.S. Atty., Kendall Coffey, U.S. Attorney, Linda Collins Hertz, Lawrence D. Levecchio, Dennis R. Bedard, Asst. U.S. Attys., Miami, FL, for the U.S. in No. 93–4906.

Richard Strafer, Quinon & Strafer, Miami, FL, for Shenberg & Sepe in No. 93–4906.

Before HATCHETT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In these "Operation Court Broom" appeals, we affirm the convictions and order resentencing of one of the appellants. The facts that follow are either undisputed or represent factual inferences that the jury was entitled to draw.

## FACTS

In November 1988, the citizens of Dade County, Florida, elected judicial candidate Roy T. Gelber to the Circuit Court of the Eleventh Judicial Circuit of Florida. Gelber, prior to taking office, arranged with his former law partner, Stephen Glass, to appoint Glass as special assistant public defender (SAPD). In return for SAPD appointments, Glass agreed to give Gelber one-third of the fees received.[1] Gelber made similar kickback arrangements with other lawyers in Miami while in office.[2] Also in 1988, Gelber became close friends with Dade County Court judicial candidate Harvey N. Shenberg. Shenberg, who also won his bid for election, advised Gelber regarding the acceptance of kickbacks and other illegal schemes. During one of Shenberg's conversations with Gelber, Shenberg suggested that Gelber add one of Shenberg's former law partners, Manny Casabielle, to the court appointment list

---

1. As a circuit judge in the criminal division, Gelber had authority to appoint private attorneys as SAPDs to represent indigent defendants when a conflict of interest arose with the Public Defender's Office. Gelber, however, never received any kickbacks from the Glass appointments.

2. Miami attorneys William Castro, Kent Wheeler, Arthur Luongo, Randolph Ferguson, Harry Boehme, and Nancy Lechtner all paid Gelber twenty to twenty-five percent of the SAPD fees they received.

in exchange for kickbacks of twenty-five percent. Gelber agreed. Thereafter, Shenberg periodically gave Gelber money in amounts ranging from $500 to $1,200 on Casabielle's behalf. Oftentimes, Gelber directed Shenberg to hold the money for safekeeping. During this same time period, Circuit Judge Alfonso C. Sepe talked with Gelber about appointing Arthur Massey, a private lawyer, as SAPD. Gelber appointed Massey in two cases for which Massey paid Gelber $1,000 in cash. Gelber eventually grew concerned that his repeated appointments of the same lawyers would raise suspicion; thus, in an attempt to avoid detection, Judge Sepe began appointing lawyers from Gelber's court appointment list.

State and federal officials (the government) eventually learned of the kickback scheme, and in 1989, the government launched a sting operation called "Operation Court Broom" to investigate corruption in the Circuit Court of Dade County. The government employed Raymond Takiff, a lawyer and a longtime friend of Gelber, to work undercover and tape-record telephone conversations and meetings with Gelber and others suspected of corruption. In August 1989, Takiff, posing as a corrupt lawyer with ties to a fictitious South American drug trafficker named "Peter," approached Gelber requesting Gelber's assistance in influencing criminal cases pending against Peter's employees. Gelber accepted $11,000 from Takiff and gave Shenberg $5,000 of the money to place in Shenberg's home safe. The next month, Takiff asked Gelber to investigate whether Peter's employee, Jose Angel Rapard, cooperated with authorities in exchange for the dismissal of an attempted murder charge pending against him. During their meeting, Takiff disclosed to Gelber that Peter believed that Rapard informed the police of a pending cocaine deal in exchange for the dismissal of the charge. Gelber and Shenberg, after reviewing Rapard's court file, agreed that the circuit judge handling the case dismissed it after the victim failed to appear. Gelber subsequently reported to Takiff that the circuit judge dismissed the attempted murder charges against Rapard for legitimate reasons.

Several months later, in March 1990, Takiff informed Gelber that the police searched one of Peter's employee's hotel room pursuant to a warrant Gelber signed.[3] Takiff told Gelber that Peter wanted the $143,000 in cash and jewelry seized in the search returned and information regarding the identity of the confidential informant. Gelber initially told Takiff that he could not assist him because he placed the warrant affidavit under seal. Gelber, however, subsequently agreed to hear Takiff's motion to return property and unseal the affidavit. After Gelber's meeting with Takiff, Gelber discussed Takiff's latest request with Shenberg. Gelber told Shenberg that he intended to receive a portion of the seized jewelry and money as payment for granting the motion. Shenberg responded stating that he did not believe that the request would raise any "red flags."

On March 20, 1990, Gelber conducted a hearing on Takiff's motion to return property and to unseal the affidavit. Gelber deferred ruling on the motion until March 22, 1990, and ordered the prosecutor to provide him with a copy of the sealed affidavit for *in camera* review. The following day, after Gelber had made a photocopy of the affidavit, he met with Takiff intending to provide Takiff with the name of the informant. Before Gelber divulged the name, Takiff informed Gelber that Peter intended to kill the informant. After learning of the murder plot, Gelber refused to disclose to Takiff the name of the informant. The next morning, Gelber ruled on the motion to return property ordering that the state return the seized jewelry to the defendant, that the state file a forfeiture action within ten days or return the seized cash, and that the warrant affidavit remain under seal to protect the informant's identity. Later that evening, Gelber met with Shenberg to inform him that Peter

3. As part of the undercover sting operation, officers presented Gelber with a fictitious search warrant affidavit seeking authorization to search a motel room for narcotics and cash. The warrant affidavit contained the name of a confidential informant who provided the information supporting the warrant. Gelber signed the warrant and ordered that the affidavit remain sealed to protect the name of the informant.

intended to kill the informant. Shenberg responded to this news stating, "I don't know what the big deal is. He's just a drug dealer." Subsequently, Shenberg decided to disclose the informant's name to Takiff, and on March 24, 1990, Shenberg met with Takiff for the first time. Shenberg, identifying himself as Gelber's best friend, stated that he had the information Takiff requested from Gelber. Shenberg then told Takiff that he would provide him with the name of the informant upon three conditions: (1) that Peter not murder the informant for forty-five days; (2) that Peter pay Shenberg $50,000; and (3) that Gelber receive a portion of the seized money and jewelry. Takiff agreed to Shenberg's terms, and Shenberg provided him with the name of the informant and facts contained in the affidavit.[4] In return, Takiff gave Shenberg $25,000 on April 2, 1990, as a partial payment for the informant's name and paid the remaining $25,000 on May 15, 1990. On May 16, 1990, Takiff gave Gelber $20,000 for his share of the seized money and property. Due to the success of this transaction, Shenberg and Gelber agreed that Takiff would deal directly with Shenberg in the future.

On July 5, 1990, Takiff telephoned Shenberg at his home requesting that Shenberg expedite a bond hearing for another one of Peter's employees. While on the telephone, Takiff stated that he had $10,000 to $12,000 available and that "the level of gratitude will at least be equal to that shown in the past." Shenberg told Takiff that he was unable to assist him but consented to meet with Takiff the next day. At their meeting the following morning, Shenberg angrily stated,

> thanks to the phone call, we're dead meat. I mean, we're never going to be able to do anything again ... I'm never going to talk on the phone with someone who talks that way ... if you would have heard the conversation, God forbid it was recorded, it was the worse conversation that I ever, ever heard.

Shenberg met with Gelber later that morning and discussed the possibility that Takiff was an informant. Although Gelber did not be-

lieve Takiff was an informant and tried to alleviate Shenberg's concern, Shenberg told Gelber that Shenberg would not resume his dealings with Takiff.

In September 1990, Takiff approached Circuit Judge Phillip Davis seeking his assistance with case-fixing. Davis told Takiff that he, Gelber, and Shenberg intended to join up with him, stating that "we want to make some money, man." The following week, Takiff gave Davis a list of four names and asked Davis to determine whether these persons had any outstanding warrants against them. Davis provided the information. After learning that two of the persons had outstanding warrants, Takiff asked Gelber to fix the outstanding warrants against them. Gelber informed Takiff that he could only fix the warrant for the individual's case assigned to Circuit Judge Arthur Snyder. Following this discussion, Gelber conferred with Shenberg to discuss the possibility of influencing the case pending before Snyder. Shenberg, still expressing distrust for Takiff, stated that he believed Sepe should approach Snyder. Sepe agreed to approach Snyder on Takiff's behalf. Sepe, however, later informed Gelber that Snyder would not agree to fix the warrant. Consequently, Gelber reported to Takiff that he could not assist him on this matter.

In December 1990, the government assigned two fictitious drug trafficking cases to Sepe's criminal docket. A short time later, Takiff informed Gelber that outstanding warrants existed against Peter's sister-in-law, Bonnie Carrillo, and her husband, Hector Penna. Takiff also informed Gelber that Peter wished to obtain low bail on Carrillo and the dismissal of the charges against her through a motion to suppress the evidence. Gelber conferred with Shenberg and discussed his conversation with Takiff. Again, Shenberg stated that he had bad feelings about Takiff and cautioned Gelber about dealing with Takiff. Gelber then attended a meeting with Sepe. At this meeting, Sepe stated he had no problem with complying with Takiff's request. Following this meeting, Gelber met with Takiff requesting $325,-

---

4. Shenberg told Takiff that the name of the informant was "Dionesio Jose Gajera." The actual name contained in the affidavit was "Dionesio Jose Guerajo."

000 in advance. Takiff complained about Gelber's terms and inquired whether the $325,000 figure included the dismissal of the charges against both Carrillo and Penna. Sepe and Gelber subsequently agreed that they would fix the cases for $200,000 for each person. On December 19, 1990, Gelber told Takiff that Sepe wanted the transaction completed on that day or not at all. Takiff failed to comply with the deadline, and Sepe cancelled the deal.

On December 28, 1990, Gelber again approached Sepe about the Carrillo case, informing him that Takiff could now proceed with the transaction. Sepe agreed to resume the negotiations with Takiff on the condition that David Goodhart, a lawyer, receive the bribery payment from Takiff. Goodhart agreed to act as "bag man" in return for $25,000 of Gelber's share of the bribery payment. Thereafter, Takiff conducted all future dealings with Goodhart. Takiff first met with Goodhart on January 8, 1991, and explained to Goodhart that the outstanding warrant against Carrillo concerned Peter most because of their relation and that Peter would pay any amount within reason to get the matter solved. Goodhart at that point wrote "$150,000, $150,000" on a legal pad stating that the transaction involved "two different things." In response, Takiff asked whether Sepe could fix the case for $200,000, and Goodhart responded that he had to discuss the new terms with Sepe. The following weeks, Takiff and Goodhart had several conversations concerning the Carrillo case; finally, on February 11, 1991, during a meeting, Takiff attempted to give Goodhart $75,000 in cash agreeing to pay another $75,000 upon dismissal of Carrillo's charges. Goodhart refused to accept the money noting that Sepe expected full payment. Approximately two weeks later, Takiff gave Goodhart $150,000 in cash. The following afternoon, Takiff brought Carrillo to Sepe's courtroom so that the state could arrest her. Sepe, over the state's objection, released Carrillo on $50,000 bail.

Takiff subsequently filed a motion to suppress the cocaine that had been seized. On April 2, 1991, Sepe conducted an evidentiary hearing and granted Carrillo's motion to suppress. The next day, Takiff gave Goodhart a proposed order suppressing the evidence in the Carrillo case. After reviewing the order, Goodhart discussed the Penna case. Both Takiff and Goodhart concluded that Penna, unlike Carrillo, did not have standing to contest the legality of the seizure. Consequently, they agreed to find alternative grounds to dismiss the charges against Penna. A few weeks later, Sepe gave Gelber a folder containing $50,000 in cash stating that "these are the papers that you've been waiting for." Gelber then gave $10,000 to Shenberg to place in Shenberg's safe admitting that he obtained the money from fixing Carrillo's case.

On May 2, 1991, Takiff discussed with Goodhart a case pending before Circuit Judge Ellen Morphonios stating that Peter also wished to secure the release and the dismissal of that case. Goodhart, believing that Judge Morphonios would fix the case for $75,000, approached Morphonios on Takiff's behalf. On May 14, 1991, Goodhart met with Takiff and told him that Morphonios refused to fix the case. The state, on June 3, 1991, dismissed the case against Carrillo because it lacked sufficient evidence to prosecute. The next day, Goodhart told Takiff to surrender Penna in Sepe's courtroom during the week of June 19. On June 8, 1991, the government ended "Operation Court Broom" and executed search warrants at the homes and offices of Gelber, Shenberg, Sepe, Goodhart, and Davis. During the execution of the search warrant, government agents seized monies matching the serial numbers of Takiff's April 2, 1990 and February 26, 1991 bribery payments to Gelber, Sepe, Shenberg, and Goodhart. Shortly after the seizure, Gelber agreed to cooperate with the government in its investigation of corruption in the Dade County Circuit Court.

## PROCEDURAL HISTORY

On May 27, 1992, a grand jury in the Southern District of Florida returned a 106-count superseding indictment against Shenberg, Goodhart, Sepe, Davis, and five other defendants. Count 1 charged all of them with conspiring to violate the Racketeer Influenced and Corrupt Organization Act

(RICO) in violation of 18 U.S.C. § 1962(d); Count 2 charged Shenberg, Goodhart, Sepe, Davis, and one codefendant with violation of RICO provisions 18 U.S.C. §§ 1962(c) and 1963(a).[5] The indictment also charged Shenberg with attempted extortion, in violation of 18 U.S.C. §§ 1951 and 2 (Counts 87, 90, 97, 98); conspiracy to commit extortion, in violation of 18 U.S.C. § 1951 (Count 92); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (Counts 88 and 91). The indictment charged Goodhart with attempted extortion, in violation of 18 U.S.C. §§ 1951 and 2 (Counts 97, 104, and 106); conspiracy to commit extortion, in violation of 18 U.S.C. § 1951 (Count 103); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(1) (Counts 98 through 100). The indictment charged Sepe with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951 (Counts 95 and 103); attempted extortion, in violation of 18 U.S.C. §§ 1951 and 2 (Counts 3, 4, 89, 96, 97, and 104); mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 2 (Counts 61 through 80); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (Counts 98 and 100 through 102).

On May 13, 1993, the district court severed the trial of Shenberg, Goodhart, Sepe, and Davis from the trial of the remaining defendants. On September 21, 1992, the trial commenced. Approximately fifteen weeks into the trial a juror discovered a cocaine-laced baggie in the jury room bathroom. The district court did not inform the parties of the juror's discovery or conduct a hearing at that time. At the close of the evidence, the defense requested a special verdict on Counts 1 and 2 requiring the jury to identify which predicate acts each defendant committed. The district court required a special verdict on Count 2; however, it denied their request with respect to Count 1. The defense also requested the district court to replace a pregnant juror prior to jury deliberations. The district court also denied this request.

The jury began deliberating on March 11, 1993. On April, 15, 1993, the pregnant juror went into labor causing the district court to stay deliberations until April 26. On April 26, the district court dismissed the pregnant juror for cause because her physician would not authorize her return on that date. Then, the district court instructed the remaining eleven jurors to continue deliberations. Later that day, the jury returned the following verdicts: Shenberg—guilty of Counts 1 and 90, not guilty of Counts 87, 88, 97, 98, and the jury could not reach a verdict on Counts 2, 91, and 92; Goodhart—guilty on Count 1, not guilty on Count 99, and the jury could not reach a verdict as to Counts 2, 97, 98, 103, and 104; Sepe—not guilty on Counts 4, 61 through 80, 89, 95 through 98, 101, and the jury could not reach a verdict on Counts 1 through 3, 103, and 104. The jury acquitted Davis on all counts.

On May 6, 1993, the district court conducted an evidentiary hearing on the discovery of the cocaine-laced baggie in the jury room. Following the evidentiary hearing, Shenberg and Goodhart filed motions for new trial. On May 24, 1993, Shenberg, Goodhart, and Sepe filed motions for acquittal. They also filed a motion to bar the government from using acquitted counts as predicate acts in Counts 1 and 2. On July 14, 1993, the district court denied Shenberg and Goodhart's motions for new trial. The court granted the motion for judgment of acquittal in part, and denied it in part, dismissing Count 104 against Goodhart and Sepe. On July 15, 1993, the district court granted motions to bar reprosecution on acquitted counts. Thereafter, the court sentenced as follows: Shenberg to 188 months imprisonment and 3 years supervised release for RICO conspiracy and extortion; Goodhart to 99 months imprisonment, 3 years supervised release, and a $100 assessment for RICO conspiracy. The government wishes to retry Shenberg and Sepe on the mistried counts. The government does not wish to retry Goodhart as to Counts 2, 97, 98, and 103. Shenberg and Goodhart appeal

---

5. The grand jury also indicted Arthur Massey, William Castro, Arthur Luongo, Harry Boehme, and Nancy Lechtner. Gelber, an unindicted co-conspirator, pleaded guilty to RICO conspiracy and testified for the government against Shenberg, Goodhart, Sepe, Davis, and the other codefendants.

their convictions and sentences, and the government cross-appeals.

## CONTENTIONS

Appellants Shenberg and Goodhart raise several contentions on appeal. First, appellants contend that insufficient evidence supports their RICO conspiracy convictions claiming that the government failed to prove that they agreed to personally commit or agreed to have others commit two predicate acts. Second, appellants contend that the district court's denial of their request for a special verdict on the RICO conspiracy count denied them their Sixth Amendment right to a fair trial. Third, appellants contend that the district court abused its discretion in continuing jury deliberations with only eleven jurors after dismissing the twelfth juror for cause. Fourth, appellants contend that the juror's discovery of a cocaine-laced baggie constituted a communication, and the court erred in failing to disclose the discovery to the appellants. Finally, appellants contend that the district court improperly calculated Shenberg's sentence under the 1989 Sentencing Guidelines and Goodhart's sentence under the 1990 Sentencing Guidelines.

On cross-appeal, the government contends that the district court erroneously applied the 1989 Sentencing Guidelines in sentencing Shenberg, claiming that Shenberg's racketeering activity continued past the date that the 1990 Sentencing Guidelines took effect. The government also contends on cross appeal that the district court erred in ruling that the doctrine of collateral estoppel bars the use of acquitted counts as predicate acts for substantive RICO and RICO conspiracy charges in a retrial of mistried counts.

## ISSUES

The following issues presented are: (1) whether sufficient evidence supports appellants' convictions; (2) whether the district court acted within its discretion in denying appellants' request for a special verdict on the RICO conspiracy count; (3) whether the district court abused its discretion in continuing jury deliberations with an eleven-member jury; (4) whether the district court erred in failing to inform appellants that a juror found a cocaine-laced baggie in the jury room; (5) whether the district court properly sentenced appellants under the Sentencing Guidelines; and (6) whether the doctrine of collateral estoppel bars the government from introducing evidence of acquitted conduct at retrial.

## DISCUSSION

### A. Sufficiency of the evidence

We review sufficiency of the evidence claims in the light most favorable to the government drawing all reasonable inferences and credibility choices made in favor of the jury's verdict. *United States v. Gilbert*, 47 F.3d 1116, 1118 (11th Cir.1995). If a reasonable person could find that the evidence establishes guilt beyond a reasonable doubt, the jury's verdict must stand. *United States v. Jones*, 933 F.2d 1541, 1546 (11th Cir.1991).

Appellants contend on appeal that insufficient evidence supports their RICO conspiracy convictions arguing that the government failed to prove that appellants each either agreed to personally commit two predicate acts or agreed to have others commit two or more such acts. Shenberg asserts that his acquittal on Counts 87, 88, 97, and 98, which mirrored predicate acts 4 and 10 of the substantive RICO count, and the jury's inability to reach a verdict on Count 92, which mirrored predicate act 7, subjected him to liability for only one predicate act, act 6.[6] Similarly, Goodhart asserts that his acquittal on Count 99 only subjected him to liability for his actions in the Carrillo case as set forth in predicate act 10.

We first note that neither the acquittal of appellants nor their codefendants on other counts alleging similar or related conduct is relevant to the issue of whether sufficient evidence supports appellants' RICO conspiracy convictions. *United States v.*

---

**6.** The indictment charged Shenberg with predicate acts 4, 6, 7, and 10 and charged Goodhart with acts 10, 11, and 13.

*Church,* 955 F.2d 688, 695 (11th Cir.), *cert. denied,* 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). These verdicts though seemingly inconsistent "could [have] easily [been] the result of mistake or lenity by the jury in acquittal as they could be proof of lack of evidence to support the conviction." *Church,* 955 F.2d at 695. For this reason, we insulate acquittal verdicts from our review of the sufficiency of the evidence.

 To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that a defendant "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise." The government can prove the existence of a RICO conspiracy agreement in one of two ways. *United States v. Russo,* 796 F.2d 1443, 1455 (11th Cir.1986). The government may either prove (1) that a defendant agreed to the overall objective of the conspiracy or (2) that the defendant personally committed two predicate acts, thereby participating in a single objective conspiracy. *United States v. Starrett,* 55 F.3d 1525, 1543 (11th Cir.1995); *Church,* 955 F.2d at 693. In proving an agreement on an overall objective, the government can use circumstantial evidence to show "that 'each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.' " *United States v. Gonzalez,* 921 F.2d 1530, 1540 (11th Cir.) (quoting *United States v. Valera,* 845 F.2d 923, 929 (11th Cir.1988)), *cert. denied,* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991). "If the government proves an agreement on an overall objective, then it is 'not necessary that the defendant agree to personally commit two predicate acts.' " *Starrett,* 55 F.3d at 1544 (quoting *Gonzalez,* 921 F.2d at 1540).

 In this case, the government presented sufficient evidence to support the finding that appellants agreed to corruptly utilize the Dade County Circuit Court system: in other words, that the appellants agreed to the overall objective of the enterprise with the knowledge that others were also conspiring to participate through a pattern of racketeering. The following evidence supports this conclusion with respect to Shenberg's conviction: Shenberg's participation with Gelber in Gelber's acceptance of kickbacks on court appointments; Shenberg's counseling of Gelber on how to conduct illegal transactions with Takiff; Shenberg's disclosure of the confidential informant's name; and Shenberg's holding, concealing, and disbursing of the proceeds derived from court appointments and case fixing. Similarly, the following evidence supports the finding that Goodhart agreed to the overall objective of the conspiracy: Goodhart's agreement to act as a bag man for Sepe; Goodhart's arrangement with Sepe to fix the Carrillo case for Takiff; Goodhart's agreeing to arrange and arranging with Sepe to fix the Penna case; and Goodhart's attempt to bribe Morphonios. Moreover, our review of the record convinces us that a reasonable person could conclude beyond a reasonable doubt that each appellant committed or agreed to have others commit at least two predicate acts.

 Goodhart next challenges the sufficiency of the evidence supporting his conviction contending that his six-month involvement at the end of the conspiracy does not constitute a sufficiently continuous RICO conspiracy pattern. To sustain a RICO conspiracy conviction based upon the commission of two predicate acts, the government must show that the predicate acts are related and amount to or pose a threat of continued criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989). In this case, Goodhart engaged in case fixing from the time he joined the enterprise until the end of the government's undercover investigation. Based on Goodhart's active involvement in fixing the Carrillo and Penna cases and the duration of his coconspirators' previous pattern of racketeering activity, we conclude that Goodhart's six-month involvement posed a threat of continued criminal activity sufficient to support his RICO conspiracy conviction.[7] Accordingly, we affirm the appellants' convictions.

7. Because we conclude that sufficient evidence supports the finding that Goodhart agreed to the

### B. Denial of special verdict on RICO conspiracy count

We review the district court's denial of request for special verdict for abuse of discretion. *United States v. Dennis*, 786 F.2d 1029, 1041 (11th Cir.1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987).

At trial, appellants requested the district court to require the jury to return a special verdict on the RICO conspiracy count. The district court denied appellants' motion thereby requiring the jury to return a general verdict on the RICO conspiracy. Appellants argue that the use of the general verdict violated their Sixth Amendment right to a fair trial because it permitted the jury to disagree as to which two predicate acts each appellant committed or agreed to commit.[8]

As a preliminary matter, we recognize that the district court's use of a general verdict for a multi-object conspiracy, though disfavored, does not violate defendant's Sixth Amendment rights. *Griffin v. United States*, 502 U.S. 46, 47–48, 112 S.Ct. 466, 468, 116 L.Ed.2d 371 (1991). Nor does the district court's refusal to require a special verdict provide an independent basis for reversing an otherwise valid conviction. *Dennis*, 786 F.2d at 1039. In this case, the district court properly instructed the jury on the elements of a RICO conspiracy violation stating in pertinent part:

> The term pattern of racketeering activity requires at least two acts of racketeering, sometimes called predicate offenses or racketeering acts. . . .
>
> . . . [Y]ou must unanimously agree as to which two or more racketeering acts, that is, predicate offenses, if any, the defendant allegedly agreed to commit or would be committed.
>
> It would not be sufficient if some of the jurors should find that the Defendant agreed to commit two of the racketeering

acts or agreed that two such acts would be committed while the remaining jurors found that he agreed to commit two different racketeering acts or agreed that two different such acts would be committed; you must all agree upon the same two racketeering acts in order to find the Defendant guilty of Count 1.

We presume that a jury follows the court's instructions. *United States v. Stone*, 9 F.3d 934, 938 (11th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994). Appellants presented no evidence that the jury failed to adhere to the district court's instructions. Accordingly, we hold that the district court acted within its discretion in denying appellants' request for a special verdict on the RICO conspiracy count.

### C. Use of eleven-member jury

Next, appellants contend that the district court abused its discretion when it failed to replace the pregnant juror after dismissing her for cause during deliberations. We review the district court's decision to continue deliberations with an eleven-member jury for abuse of discretion. *See* Fed. R.Crim.P. 23(b).

Rule 23(b) of the Federal Rules of Criminal Procedure provides for a jury of less than twelve where "the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict." Fed. R.Crim.P. 23(b). In such cases, the remaining eleven jurors can return a valid verdict. Fed.R.Crim.P. 23(b). Prior to jury deliberations commencing, the district court decided not to dismiss a pregnant juror in her seventh month of pregnancy who wanted to continue her service on the jury and who had not experienced any difficulty during pregnancy. The jury deliberated over a month without incident until the pregnant juror went into labor on April 15.[9] After the juror went into labor, the court stayed jury deliberations until Monday, April 26 to allow the

---

overall objective of the enterprise, we do not address Goodhart's argument that racketeering act 10 involving the Carrillo case and act 11 involving the Penna case are multiplicitous.

**8.** As previously stated, sufficient evidence supports the finding that appellants agreed to the

overall objective of the RICO conspiracy, therefore the law in this circuit does not require the jury to also find that each appellant committed two predicate acts.

**9.** For the remainder of this discussion we will refer to the pregnant juror as "the juror."

juror to give birth and continue jury duty. The juror's physician, however, would not authorize the juror's return for jury duty until May 13. On April 26, the district court dismissed the juror for cause, finding that the two additional weeks would cause undue delay and instructed the remaining eleven jurors to continue deliberations.

██ "The most substantial concern about substitution of an alternate juror after deliberations have begun is that the alternate might be coerced by jury members who might have already formulated positions or viewpoints or opinions." *United States v. Phillips,* 664 F.2d 971, 995–96 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In spite of this concern we found such substitution proper in *Phillips.* In *Phillips,* we held that the district court properly replaced a juror with an alternate juror two days after jury deliberation commenced finding that the district court utilized sufficient safeguards to neutralize the possible prejudice to the defendants. *Phillips,* 664 F.2d at 996. The district court in *Phillips* questioned the remaining eleven jurors regarding their ability to "wipe" from their minds the previous two days of deliberations prior to placing the alternate juror on jury and directing the jury to begin "anew." *Phillips,* 664 F.2d at 991. Unlike *Phillips,* the jury in this case deliberated for a month prior to the dismissal of the juror. Because of the duration of jury deliberations in this case, we believe that a far greater risk of juror coercion existed. We also believe that the district court's ability to implement safeguards sufficient to neutralize the potential prejudice to defendants is extremely limited under such circumstances. Accordingly, we conclude that the district court acted within its discretion in continuing deliberations with only eleven jurors and reject appellants' contention that the court erred in not replacing the juror prior to deliberations, noting that it would have been improper for the court to replace a juror for cause capable of serving.

**D. Juror's discovery of cocaine-laced baggie**

██ During the middle of appellants' trial, a juror presented the court security officer with a trampled cocaine-laced baggie she found in the jury bathroom.[10] The district court, observing no indication that any juror used drugs and noting that the discovery occurred following a five-day recess, did not disclose the discovery to the parties or question any of the jurors regarding the discovery. Appellants argue that the juror's presentation of the baggie constituted a communication to the court, and therefore, the district court's conduct violated Federal Rule of Criminal Procedure 43(a).[11]

Rule 43(a) requires trial courts to disclose communications with jurors and provide the defendant with an opportunity to be heard prior to responding to the communication. *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975). The juror's discovery in this case, however, did not constitute a communication within the meaning of rule 43(a) because the juror presented the baggie without comment on its effects on her ability to deliberate. Even assuming that the juror's presentation of the baggie constitutes a communication, the district court's actions at most establish harmless error because the district court did not respond to the jury's communication for fear that the appearance of any suspicion concerning the integrity of any juror would not serve the interest of justice. *See United States v. Rodriguez,* 765 F.2d 1546, 1553–54 (11th Cir.1985) (no error where the court failed to answer jury's question prior to verdict). Because we conclude that the district court did not abuse its discretion, we find it unnecessary to address appellants' other arguments regarding the juror's discovery.

**E. Sentencing**

██ We review the sentencing court's findings of fact for clear error and its appli-

---

**10.** After discovery of the baggie, the court security officer regularly performed cursory checks of the jury room and garbage for similar contraband. The court found no contraband any other time during the trial.

**11.** Appellants learned of the juror's discovery from a newspaper article in the *Miami Herald.*

cation of those facts to the Sentencing Guidelines *de novo.* *United States v. Rojas,* 47 F.3d 1078, 1080 (11th Cir.1995).

### 1. Shenberg

The jury convicted Shenberg of RICO conspiracy and extortion induced under the color of official right. In sentencing Shenberg, the district court applied section 2C1.2 of the Sentencing Guidelines finding Shenberg's criminal activity most analogous with the guidelines offenses involving public officials.[12] Prior to obtaining the base offense level under the 1989 Sentencing Guidelines, the district court determined that the underlying racketeering activity of the RICO conspiracy conviction constituted two distinct criminal violations: (1) soliciting or receiving bribes and extortion under the color of official right and (2) aiding and abetting a conspiracy to commit murder.[13] Consequently, the district court classified Shenberg's RICO conspiracy and extortion conviction into the following three criminal violation groups—"conspiracy to solicit or receive bribes," "conspiracy to commit murder," and "extortion."[14] The court subsequently assigned Shenberg a base offense level of 20 for the "conspiracy to commit murder" violation group because it carried the highest base level offense of the three groups.

In obtaining the base level offense of the "conspiracy to commit murder" violation group, the court applied section 2C1.1(c)(1), the cross referencing provision, and borrowed the applicable guidelines for a conviction for conspiracy to commit murder.[15] *See* U.S.S.G. § 2A2.1. The district court then added 4 two-point enhancements for "more than minimal planning" pursuant to section 2A2.1(b)(1), financial motivation pursuant to section .2A2.1(b)(4), abuse of a position of public trust pursuant to section 3B1.3, and an "unusually" vulnerable victim pursuant to section 3A1.1, increasing Shenberg's offense level to 28. Next, the district court added a one-point multi-count adjustment to the offense level, pursuant to section 3D1.4, giving Shenberg a combined offense level of 29.[16] The district court, finding that the combined offense level did not adequately reflect the systematic and pervasive corruption of Dade County judiciary and loss of public confidence in government, departed upward 5 levels, from 29 to 34, pursuant to section 5K2.0. *See* U.S.S.G. § 5K2.0.

Shenberg challenges the calculation of his sentence on several grounds. First, Shenberg contends that the district court's application of the conspiracy to commit murder guideline constitutes an improper use of section 2C1.1(c)(1). Second, Shenberg contends that the district court erred in applying the vulnerable victim and "more than minimal planning" enhancement to his offense level.[17]

**12.** Section 2E1.1 of the United States Sentencing Guidelines sets the base offense level of 19 for a defendant convicted of RICO conspiracy unless the offense level applicable to the underlying racketeering activity is greater. U.S.S.G. § 2E1.1. In sentencing Shenberg, the district court mistakenly applied section 1B1.2(d) rather than section 2E1.1. Section 1B1.2(d) provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). This mistake, however, does not affect the calculation of Shenberg's sentence because section 2E1.1, like section 1B1.2(d), allows cross-referencing under section 2C1.1.

**13.** The district court classified the underlying racketeering activity into separate violations pursuant to U.S.S.G. § 1B1.2(d).

**14.** The presentence investigation report (PSI) separately calculated Shenberg's offense level for the "conspiracy to solicit or receive bribes" and the "extortion" violation groups. Because the district court did not sentence Shenberg according to either of these calculations, we do not address Shenberg's contention that the probation officer improperly scored these violation groups under the Sentencing Guidelines.

**15.** Section 2C1.1(c)(1) provides that "[i]f the bribe was for the purpose of concealing or facilitating another criminal offense," cross reference. U.S.S.G. § 2C1.1(c)(1) (1989).

**16.** For purposes of U.S.S.G. § 3D1.4, the court combined the "conspiracy to commit murder" and the "extortion" violation groups and assigned it one point. The court assigned the "conspiracy to solicit or receive bribes" violation group one-half point. The combined score required an increase of one level.

**17.** Shenberg also contends that the district court improperly applied a two-point enhancement for more than one bribe under 2C1.1(b)(1) and fi-

Finally, Shenberg contends that the district court failed to find sufficient aggravating circumstances to warrant a 5 level upward departure.

■ We first address the district court's application of section 2C1.1(c)(1). Section 2C1.1(c)(1) authorizes the court to cross reference sentencing guidelines where "the bribe [paid] was for the purpose of concealing or facilitating another criminal offense." U.S.S.G. § 2C1.1(c)(1) (1989). The district court, adopting the factual findings in the PSI, found that Shenberg disclosed the confidential informant's name for payment with the knowledge that Peter intended to murder the informant and that Shenberg participated in the planning of the murder in requiring that murder not occur for at least forty-five days.[18] Based on this finding the district court utilized section 2C1.1(c)(1) and calculated Shenberg's sentence under section 2A2.1. *See* U.S.S.G. § 2C1.1(c)(1) (1989). Shenberg argues that the application of the cross referencing provision in this case impermissibly over-represents the severity of the underlying crime and "artificially" inflates the guidelines range. We disagree.

■ According to the language in the Sentencing Guidelines, Shenberg's disclosure of the confidential informant's name is tantamount to conspiracy to commit murder because Shenberg released the name for payment with the understanding that it would facilitate the informant's murder. We give the Sentencing Guidelines their plain meaning effect, "except in the most extraordinary situation where the language leads to an absurd result contrary to clear legislative intent." *United States v. Pompey,* 17 F.3d 351, 354 (11th Cir.1994) (citations omitted). Because no absurd result occurred in this case, we affirm the district court's application of section 2C1.1(c)(1).

■ Next, Shenberg argues that the court improperly applied the "vulnerable vic-

tim" enhancement because the alleged murder conspiracy involved a fictitious confidential informant. Section 3A1.1 provides for a two-point enhancement "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable ... or otherwise particularly susceptible to criminal conduct." Shenberg urges this court to hold that the district court improperly applied the "vulnerable victim" enhancement solely because the victim in this case is a fictitious one. We cannot so hold in light of existing law in this circuit. This circuit has repeatedly recognized that the "vulnerable victim" enhancement " 'focuses chiefly on the conduct of the defendant' and should be applied only where *'the defendant selects the victim'* due to the victim's perceived vulnerability to the offense." *United States v. Page,* 69 F.3d 482, 488 (11th Cir.1995) (quoting *United States v. Long,* 935 F.2d 1207, 1210 (11th Cir.1991)) (emphasis in original). "It is the perpetrator's perception, not actual vulnerability, that triggers enhancement." *United States v. Davis,* 967 F.2d 516, 523 n. 8 (11th Cir.1992), *rev'd on other grounds,* 30 F.3d 108 (11th Cir.1994) (government agent posing as extortion victim did not affect the "vulnerable victim" analysis because the defendant did not know of victim's affiliation with the government). Adhering to this line of reasoning, we conclude that the district court properly applied the "vulnerable victim" enhancement in this case. Shenberg knew that the state requested that the name of the informant remain under seal to protect the informant from retaliation from Peter. Shenberg also knew that Peter intended to murder the informant. Nevertheless, Shenberg disclosed the informant's name in exchange for payment. Shenberg should not derive a benefit for purposes of sentencing merely because the informant Shenberg believed Peter would murder did not exist. We therefore hold that the district court proper-

nancial motivation under section 2A2.1(b)(4). In addition, Shenberg contends that the district court improperly added a one point adjustment to his offense level for more than one "group" under section 3D1.4. After reviewing the record, we find that these arguments lack merit and therefore do not warrant discussion.

**18.** As set forth in the facts section of this opinion, Peter and the confidential informant are both fictitious persons the government created for purpose of its undercover sting operation.

ly applied the "vulnerable victim" enhancement pursuant to section 3A1.1.

■ The district court, however, erred in applying the two-point enhancement for "more than minimal planning." Section 2A2.1(b)(1) under the 1989 Sentencing Guidelines requires an actual assault. *See* U.S.S.G. § 2A2.1(b)(1) (1989). Because an assault on a fictitious person is impossible, the "more than minimal planning" enhancement cannot apply to Shenberg's sentence.

■ Finally, Shenberg contends that the district court improperly departed upward five levels based upon the court's finding that Shenberg's conduct was part of a systematic corruption of a governmental function causing loss of public confidence in government. When reviewing whether the district court properly departed from the Sentencing Guidelines, we employ a three-part test. *United States v. Weaver,* 920 F.2d 1570, 1572 (11th Cir.1991). First, we determine whether the Sentencing Commission adequately considered the particular factors the district court relied on for the basis of its departure. *United States v. Godfrey,* 22 F.3d 1048, 1053 (11th Cir.1994). Second, assuming that the Sentencing Commission did not adequately consider the factors, we determine whether the district court's reliance on those factors furthers the objectives of the guidelines. *Godfrey,* 22 F.3d at 1053. And, finally, if those factors further the objectives of the guidelines, we determine the reasonableness of the district court's departure. *See United States v. Alpert,* 28 F.3d 1104, 1108 (11th Cir.1994).

■ In this case, the district court found that Shenberg's conduct caused "an undermining of the system of justice in [Dade] County and in this country". Thus, in order to satisfy the first inquiry, we apply *de novo* review and look to the language of the Sentencing Guidelines to see if the Sentencing Commission adequately considered systematic corruption. Section 2C1.1's commentary specifically states, "[w]here the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a government function, process, or office that may cause loss of public confidence in govern-

ment, an upward departure *may be warranted."* § 2C1.1, comment. (n. 5) (1989) (emphasis added). This language clearly indicates that the Sentencing Commission did not adequately account for systematic corruption resulting in loss of public confidence in government. We note that commentary that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute or is inconsistent with or a plainly erroneous reading of the guideline. *See Stinson v. United States,* 508 U.S. 36, 41–46, 113 S.Ct. 1913, 1917–19, 123 L.Ed.2d 598 (1993).

Finding that the Sentencing Commission failed to adequately consider systematic corruption, we now determine whether the district court's reliance on the systematic corruption of the Circuit Court of Dade County furthers the objectives of the guidelines. An "[u]pward departure from the guidelines range is permitted only when *aggravating circumstances* exist that were not adequately considered by the Sentencing Commission when it developed the guidelines." *Alpert,* 28 F.3d at 1108 (citing 18 U.S.C. § 3553(b)) (emphasis added). The district court found that Shenberg's conduct caused the loss of public confidence in government in Dade County and throughout the United States. This degree of loss of public confidence clearly qualifies as an aggravating circumstance. The government, however, presented no proof of local community sentiments concerning Shenberg's conduct or proof of loss of public confidence in the government. Consequently, Shenberg argues that the departure fails this prong of the test. We disagree.

■ For purposes of the guidelines, the government must prove the facts "used" in sentencing by a preponderance of the evidence. *See United States v. Cornog,* 945 F.2d 1504, 1514 (11th Cir.1991). In this case, the government overwhelmingly proved systematic corruption by a preponderance of the evidence. The guidelines do not require a showing of actual public harm. The commentary to section 2C1.1 only requires the court to find that the corruption "may" cause loss of public confidence in the government. Whether the systematic corruption of the circuit court caused actual loss of public con-

fidence in government, of course, is not subject to reasonable dispute. Therefore, the district court can properly take judicial notice of public reaction to this case and consider it in making its decision to depart from the Sentencing Guidelines. *See* Fed.R.Evid. 201. Moreover, the government's submission requesting an upward departure from the guideline range gave Shenberg reasonable notice that the district court was contemplating an upward departure. The district court also gave Shenberg an opportunity to comment before it departed from the sentencing range. Accordingly, we do not find such judicial notice improper.

 In the alternative, Shenberg argues the district courts's application of the 2–point enhancement for abuse of position of trust under section 3B1.3 adequately accounts for the alleged harm to the public, and therefore asserts that the departure constitutes double counting. We also reject this argument. "District courts may not enhance a sentence on the basis of the same incidents that they used to determine the base level for sentencing." *United States v. Ledesma,* 979 F.2d 816, 820 (11th Cir.1992). The district court in this case, however, did not base its decision to depart on the same considerations that motivated its application of the abuse of position of trust enhancement. In applying the abuse of position of trust enhancement, the district court only considered Shenberg's conduct with respect to his position as an elected official of Dade County, and not on the basis of systematic corruption.[19] Consequently, no double counting occurred in sentencing Shenberg. We therefore find that a departure based on systematic corruption and massive loss of public confidence furthers the objectives of the guidelines.

Finally, we review the district court's departure for reasonableness. The district court calculated Shenberg's total offense level at 29. The appropriate sentencing guideline range with a criminal history of category I is 87–108 months imprisonment. The district court departed from this guideline range giving Shenberg an offense level of 34 which carries a sentence range of 151 to 188 months. The court sentenced Shenberg to 188 months imprisonment. We find that the district court reasonably departed from the Sentencing Guidelines range. Accordingly, we affirm Shenberg's sentence on all respects, with the exception of the district court's application of the 2–point enhancement for "more than minimal planning."

### 2. Goodhart

The district court in sentencing Goodhart also applied the cross-referencing provision in section 2C1.1 and sentenced Goodhart as an accessory after the fact to drug trafficking under section 2X3.1 because his underlying racketeering activity involved fixing a case in which the state had allegedly seized twelve kilograms of cocaine.[20] This application of the Sentencing Guidelines resulted in an offense level of 26 instead of RICO violation base offense level of 19. The district court then added a two-point enhancement under section 3B1.3 for use of a special skill, giving Goodhart a total offense level of 28.

 Goodhart contends that the two-point enhancement for use of special skill under section 3B1.3 constituted an improper and erroneous application of the Sentencing Guidelines.[21] Goodhart argues that his status as an attorney did not facilitate the commission of the RICO conspiracy because his duties as a "bag man" did not depend on his

---

**19.** Section 3B1.3 provides, "[i]f the defendant abused a position of public or private trust … in a manner that significantly facilitated the commission or the concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3.

**20.** The district court based its sentencing determination on Goodhart's involvement with the Carrillo matter. As set forth in the facts section of this opinion, the government filed fictitious drug trafficking charges against Peter's sister-in-law Bonnie Carrillo.

**21.** Goodhart also contends that the district court erred in applying section 2C1.1(c)(2) cross-referencing provision and section 2X3.1 in sentencing him as an accessory after the fact to drug trafficking because his racketeering activity involved a fictitious case. We summarily affirm the district court's use of section 2C1.1(c)(2)'s cross referencing provision for the reasons set forth in our discussion of Shenberg's sentence.

status as an attorney. We review sentence enhancements based on special skill for clear error. *See United States v. Malgoza,* 2 F.3d 1107, 1109 (11th Cir.1993). The district court found that Goodhart, as a part of the RICO conspiracy involving case-fixing, read arrest affidavits, reviewed pleadings, proposed suppression orders, and made suggestions based upon his experience and education as to the amount of bond, the booking procedure, and the possibility of an appeal of Sepe's suppression order, all in an effort to avoid raising "red flags." The record supports this finding; therefore, we find no clear error. We therefore conclude that the district court properly applied the special skill enhancement.

### F. Cross appeal

#### 1. Sentencing Shenberg under the 1989 Sentencing Guidelines

On cross appeal, the government contends that the district court improperly sentenced Shenberg under the 1989 Sentencing Guidelines and argues that the district court should resentence Shenberg under the 1990 Sentencing Guidelines. At trial the government sought to prove that Shenberg, after refusing to deal with Takiff in July 1990, continued to advise Gelber and Sepe regarding their illegal activity and continued to hold the illegal proceeds for Gelber in his possession after November 1, 1990, the effective date of the 1990 Sentencing Guidelines. At Shenberg's sentencing hearing, the district court, however, found that Shenberg's participation in the conspiracy ended in July 1990. As previously stated, we review the district court's factual findings for purposes of the Sentencing Guidelines for clear error. Because factual support exists to justify the court's finding, we find no clear error.

#### 2. Application of collateral estoppel in retrial of mistried counts

Also on cross-appeal, the government challenges the district court's July 15, 1993 order. The district court in this order held that direct estoppel barred the government from using acquitted counts as predicate acts in the substantive RICO count during the retrial of cross-appellees Shenberg and Sepe on the mistried counts.[22] The district court also held that collateral estoppel barred the government from proving the existence of a RICO conspiracy agreement with the evidence the government used to support the acquitted counts. We review questions of law *de novo.* *United States v. Terry,* 60 F.3d 1541, 1543 (11th Cir.1995).

#### a. Substantive RICO count

It is well settled that the Double Jeopardy Clause of the Fifth Amendment does not apply in the context of a retrial of mistried counts. *Richardson v. United States,* 468 U.S. 317, 323, 104 S.Ct. 3081, 3084–85, 82 L.Ed.2d 242 (1984). This is because a retrial is a continuation of the original jeopardy. *Richardson,* 468 U.S. at 323, 104 S.Ct. at 3084–85. Although double jeopardy does not bar the government from reprosecuting defendants on mistried counts, estoppel principles may nevertheless apply to preclude the government from relitigating certain issues on retrial. *See Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Brown,* 983 F.2d 201, 202 (11th Cir.1993). In criminal cases, courts generally refer to the estoppel principles as collateral estoppel. In the context of a retrial, however, the term "collateral estoppel" is a misnomer because a "retrial cannot be 'collateral' if it is a 'continuation' of the first trial." *United States v. Bailin,* 977 F.2d 270, 276 (7th Cir.1992). For this reason, the term "direct estoppel" more appropriately characterizes the application of estoppel principles in the context of a retrial. *See Bailin,* 977 F.2d at 276. Our analysis, however, remains the same, whether we refer to the application of estoppel principles as "direct" or "collateral." *Bailin,* 977 F.2d at 280 n. 15. To avoid confusion, we will therefore refer to the estoppel principles collectively as collateral estoppel for purposes of this discussion.

---

22. Since the filing of this cross-appeal, the government has moved to dismiss its appeal against Goodhart and Shenberg on this issue. We previously granted the motion to dismiss with respect to Goodhart and carried the motion with the case as to Shenberg. In light of our decision today, we deny the motion to dismiss the cross-appeal against Shenberg as moot.

■ In *Ashe,* the Court recognized that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel. *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. Based on this acknowledgement, the government argues that the incorporation of the collateral estoppel doctrine in Double Jeopardy Clause limits the application of collateral estoppel to circumstances where only double jeopardy applies. Although this court has not squarely addressed this question, the Seventh Circuit in *Bailin* rejected the government's argument, stating:

> The government's argument assumes that because collateral estoppel is "embodied" in the Double Jeopardy Clause, collateral estoppel is co-extensive with the Double Jeopardy Clause's other protections. Thus, the government asks us to hold that collateral estoppel can never apply in circumstances where double jeopardy does not. Such a holding would eliminate collateral estoppel from criminal cases and overrule *Ashe.* A criminal defendant has no need for the benefits of issue preclusion if his entire prosecution is barred by double jeopardy; if double jeopardy bars the entire prosecution, then a court need not consider whether particular issues are precluded from relitigation.

*Bailin,* 977 F.2d at 275. We agree with the Seventh Circuit and hold that the Double Jeopardy Clause does not limit the application of collateral estoppel to only cases in which double jeopardy applies.

■ The doctrine of collateral estoppel applies "when an issue of ultimate fact has once been determined by a valid and final judgment." *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. In such instances, the same parties cannot relitigate the ultimate issue in any future lawsuit. *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. When determining whether collateral estoppel applies in the context of a retrial, *Ashe* requires courts to engage in a two-part inquiry. *See Brown,* 983 F.2d at 202. First, courts must examine the verdict and the record to see "what facts," if any, were necessarily determined in the acquittal at the first trial. *Brown,* 983 F.2d at 202. Second, the court must determine whether the previously determined facts constituted "an essential element" of the mistried count. *Brown,* 983 F.2d at 202. Applying *Ashe's* two-part test, the district court correctly noted that most of the crimes Sepe and Shenberg were charged with mirrored predicate acts listed in the substantive RICO count. Based on this finding, the district court concluded that the acquitted counts necessitated the finding that the jury also decided the predicate acts which mirrored the acquitted counts in Sepe and Shenberg's favor in the first trial. Consequently, the district court held that collateral estoppel precluded the government from listing these predicate acts as "essential elements" of the substantive RICO count. We find no error with the district court's application of collateral estoppel to the substantive RICO count. Accordingly, we affirm the district court's order barring the government from using acquitted counts as predicate acts in the substantive RICO count.

#### b. RICO conspiracy count

■ In the alternative, the government argues that even if collateral estoppel applies to bar the use of acquitted counts as predicate acts in the substantive RICO count, it does not preclude the government from introducing the evidence it offered to support the acquitted counts as predicate acts in the RICO conspiracy count. We agree. Like the substantive RICO count, the predicate acts in the RICO conspiracy count also mirror crimes charged in the indictment. Unlike the substantive RICO count, the acquitted counts do not necessitate the finding that the issue of ultimate fact, i.e., agreement to commit two or more predicate acts or agreement to the overall objective of the enterprise, was necessarily determined. This is because the actual commission of the underlying crime does not constitute "an essential element" of RICO conspiracy. *United States v. Eley,* 968 F.2d 1143, 1146 (11th Cir.1992).

The Supreme Court's holding in *United States v. Felix,* 503 U.S. 378, 380, 112 S.Ct. 1377, 1379–80, 118 L.Ed.2d 25 (1992), further supports this conclusion. In *Felix,* the Court allowed the government in its conspiracy prosecution to rely upon overt acts based upon substantive offenses for which the defendant had been convicted holding that the

"prosecution of a defendant for conspiracy, where certain of the overt acts relied upon by the Government are based on substantive offenses for which the [issues have] been previously [decided], does not violate the Double Jeopardy Clause." *Felix*, 503 U.S. at 380, 112 S.Ct. at 1379–80. In that case, a jury in the Eastern District of Oklahoma convicted the defendant on a multi-count indictment for conspiracy, manufacture and possession with intent to distribute methamphetamine, maintaining place for manufacturing methamphetamine, and possession of precursor chemicals. Prior to that trial, a jury in the Western District of Missouri convicted the defendant on a single count of attempting to manufacture methamphetamine. On appeal, the defendant argued that the Double Jeopardy Clause barred the second prosecution because the government based its case on proof of the same conduct, actors and time frames as the prosecution in Missouri. The Tenth Circuit reversed the defendant's conviction on most of the counts holding that the Double Jeopardy Clause barred successive prosecution of the defendant where the government based its charges on evidence introduced at the previous trial. The Court reversed the Tenth Circuit holding that "mere overlap in proof between two prosecutions does not establish a double jeopardy violation." *Felix*, 503 U.S. at 386, 112 S.Ct. at 1382. The Court noted that its holding in *Felix* adhered to "the basic, yet important, principle that the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct." *Felix*, 503 U.S. at 387, 112 S.Ct. at 1383.

In this case, the district court recognized that "[c]onspiracy to commit a crime is sepa-

rate and distinct from the underlying crime, and [that] an acquittal as to one charge does not affect the verdict as to the other." The district court, however, erroneously concluded that the doctrine of collateral estoppel barred the government from proving a RICO conspiracy agreement with predicate acts mirroring the acquitted substantive counts. In reaching its conclusion, the district court applied this circuit's holding in *United States v. Gornto*, 792 F.2d 1028 (11th Cir.1986). In *Gornto*, we held that in the context of a retrial the doctrine of collateral estoppel barred the government from proving mistried conspiracy counts with evidence of substantive offenses the jury acquitted the defendant of in the first trial. *Gornto*, 792 F.2d at 1031. The *Gornto* court reasoned that to hold otherwise would not provide a sufficient shield against the threat of double jeopardy. *Gornto*, 792 F.2d at 1031. Since our decision in *Gornto*, the Supreme Court has rejected this line of reasoning holding that the doctrine of collateral estoppel does not preclude the government from introducing relevant and probative evidence that is otherwise admissible under the Federal Rules of Evidence. *See Dowling v. United States*, 493 U.S. 342, 348–49, 110 S.Ct. 668, 672–73, 107 L.Ed.2d 708 (1990).[23] Consequently, we turn our attention back to the Court's decision in *Felix*.

In the context of RICO conspiracy, the overt acts the Court speaks of in *Felix* constitute predicate acts. As the Court in *Felix* allowed the government to rely upon overt acts based upon substantive offenses for which the defendant had been previously convicted, it follows that we must also allow the government to rely upon the predicate acts mirroring the substantive counts the

---

**23.** In *Dowling*, the district court permitted the government to introduce evidence of a prior robbery of which the defendant had been acquitted to prove identity of the bank robber in the instant case pursuant to Federal Rules of Evidence 404(b). The defendant on appeal argued that his prior acquittal precluded the government from introducing evidence which supported the charges in the acquitted case during his trial on unrelated bank robbery charges. The Supreme Court disagreed and declined to extend "the collateral estoppel component of the Double Jeopardy Clause to exclude in all circumstances ... relevant and probative evidence that is otherwise admissible under the rules of evidence simply

because it relates to alleged criminal conduct for which a defendant has been acquitted." *Dowling*, 493 U.S. at 348, 110 S.Ct. at 672. Based on the Court's holding in *Dowling*, we conclude that *Gornto* no longer constitutes good law to the extent it holds that the doctrine of collateral estoppel bars the government from introducing the underlying evidence of acquitted substantive counts in the retrial of the mistried conspiracy count. *See United States v. Machado*, 804 F.2d 1537, 1543 (11th Cir.1986) (holding that only intervening law from the Supreme Court or this court sitting *en banc* can overrule a prior panel decision).

jury previously decided in the retrial of the RICO conspiracy count. Although, the Court reached its decision in *Felix* based upon the Double Jeopardy Clause and not the doctrine of collateral estoppel, the result in this case remains the same because the Double Jeopardy Clause incorporates the doctrine of collateral estoppel. *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. We therefore hold that the doctrine of collateral estoppel does not bar the government from using predicate acts that mirror acquitted substantive offenses to prove RICO conspiracy.

## CONCLUSION

For the foregoing reasons, we affirm Shenberg's and Goodhart's convictions and Goodhart's sentence. We, however, reverse Shenberg's sentence and remand for resentencing consistent with this opinion. The district court's order barring the government from using acquitted counts as predicate acts in the substantive RICO counts is affirmed. We otherwise reverse the portion of the district court's order barring the government from proving the RICO conspiracy and other hung counts with the evidence the government used to support the acquitted counts.

CONVICTIONS AFFIRMED and RESENTENCING ORDERED.