[Crim. No. 9422. Fourth Dist., Div. Two. Jan. 16, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ALLEN BENTON, Defendant and Appellant.

**COUNSEL**

David F. Blaisdell, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Alan S. Meth and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GARDNER, P. J.**—After an unsuccessful motion to suppress under Penal Code section 1538.5, the defendant was found guilty of robbery in the first degree.

## The Robbery

Mrs. Barnhill and her daughter, Sainna Okeson, were seated at the kitchen table in Mrs. Barnhill's apartment on Keel Street in Anaheim on the evening of August 2, 1976. Around midnight, a black man entered. With pistol in hand, he said, "Don't say a word, don't say a mother-fucking word."[1] Two more black men entered, one of whom was the defendant. He was wearing a knit-type watch cap. The men robbed Mrs. Barnhill. One of them then announced that he ought to rape the ladies. He was dissuaded by the other robbers, not for any humanitarian reasons but because the robbers heard police approaching. In addition to taking $70 from Mrs. Barnhill, $2 or $3 were taken from Mrs. Okeson. One of the robbers carried away Mrs. Barnhill's radio.

## The Motion To Suppress

With that as a background, we proceed to the evidence adduced at the section 1538.5 hearing which is the basis for the defendant's sole contention on appeal that his constitutional rights were violated during his apprehension by the police.

Around midnight of August 2, Officer Petersen of the Garden Grove Police Department was patrolling on Keel Street when he was approached by a Mr. Perez. Mr. Perez was extremely excited. He said that some male Negro subjects were causing a disturbance in apartment No.

---

[1] It is a sad commentary on contemporary culture to compare "Don't say a word, don't say a mother-fucking word" with "Stand and deliver," the famous salutation of Dick Turpin and other early English highwaymen. It is true that both salutations lead to robbery. However, there is a certain rich style to "Stand and deliver." On the other hand, "Don't say a word, don't say a mother-fucking word" conveys only dismal vulgarity.

The speech of the contemporary criminal culture has always been a rich source of color and vitality to any language. Yet, when one compares the "bawds," "strumpets," "trulls," "cut-purses," "knaves," and "rascals" of Fielding and Smollett to the "hookers," "pimps," "Narcs," "junkies," and "snitches" of today's criminal argot, one wonders just which direction we are traveling civilization's ladder. "Hooker," at least, has traceable historical antecedents—although the descendants of General "Fighting Joe" Hooker would probably prefer that their famous ancestor be remembered for something other than his army's camp followers—such as the slaughter at Chancellorsville.

5 (Mrs. Barnhill's apartment) of a nearby apartment complex. Officer Petersen got as far as the stairway to the apartment complex just as the defendant was descending the stairs following the robbery. The officer said he wanted to talk to him. As he reached for the defendant, he saw a second black man standing on the stairs holding Mrs. Barnhill's radio. A third black man appeared at the top of the stairway. The man holding the radio threw it away and ran up the steps. The defendant broke away from the officer and took off with Officer Petersen in hot pursuit. The defendant escaped and Officer Petersen returned to apartment No. 5. There he secured the above story of the robbery and a description of the robbers. This was radioed to surrounding police units.

Officers Severson and Konieczny of the Garden Grove Police Department heard the broadcast. They were in the neighborhood. They saw a 1964 Chevrolet coming from Keel Street. Two male blacks were in the car, one of whom was wearing a watch cap. The officers started to overtake this vehicle using red lights and siren. The car began to run red lights, went down the wrong side of the highway and attained speeds of 80 to 85 miles per hour. It finally spun out of control near an apartment complex in the 800 block of South Fairview Street. The two suspects fled with the officers in pursuit. One of them was the defendant. Officer Konieczny fired at him. The defendant continued to run and finally climbed a brick wall with Konieczny still in pursuit. Konieczny climbed the wall and fired at the defendant a second time as the defendant ran into the apartment complex. Officer Severson had chased the driver but lost him when he ran into the apartment complex. The officers radioed to several converging units what had occurred and that shots had been fired.

Officer Hamann of the Santa Ana Police Department heard the broadcast and responded to the apartment complex on South Fairview Street. He was briefed on the direction the suspects had taken. He was told by a security guard that he, the security guard, had chased one of the suspects along the building and saw someone leaping the fence at the southwest corner of the building. He, the security guard, stayed there and did not see anyone leave. Officer Hamman then peeked over that fence into an apartment backyard. He saw that a screen door had been torn away from a sliding glass door of an apartment. Officer Hamann went over the fence, approached the sliding glass door and opened it two or three inches to establish that it was not locked. He looked through the kitchen window and saw the defendant and another black man sitting on a sofa watching television. He opined that this was somewhat unusual in

light of the fact that shots had been fired, sirens were wailing, a large number of officers were in the area yelling back and forth and patting-down individuals in the apartment complex. Still, these two were watching TV. They were either stone deaf or it was a remarkably absorbing television program.

At Officer Hamann's request, Officer Taylor went with him to the front door of the apartment. Both were in uniform. They knocked on the door. It was opened by a Ms. Barns who appeared frightened and said, "Let me out of here, I'm not involved." She pushed past the officers and gestured with her hand in such a way as to indicate that she wanted them to go into her residence for some reason. She was extremely nervous and appeared frightened of something within the apartment. She told the officers that a third uninvolved retarded man was in the bathroom of the apartment.

The officers entered without further compliance with Penal Code section 844 and saw the defendant and the other black man seated on the couch. They were ordered to stand up. When the defendant did, his pants fell off. This remarkable phenomenon occurred because the pants were several sizes too big for him. He was sweating and his breath was labored as though he had been running. Officer Taylor asked him where he was staying and he said, "I'm staying right here." Taylor asked him what the address was and defendant said he did not know. The officer picked up an envelope on a coffee table and it carried the name of Ms. Barns. The officer then asked defendant who else lived in the apartment. The defendant then turned to his companion and asked, "What's your name, man?" The officer asked defendant what his name was and defendant said, "Jim Long." At that point, defendant and his companion corobber, Nash, were arrested.

The officers then asked Ms. Barns if they could search the apartment. She said they could, that she did not know the defendant and that she was uninvolved and that they could look anywhere they wanted. In a search of the back bedroom, there was found, tucked under the mattress, a man's green corduroy jacket, a reddish colored watch cap, a man's blue long-sleeved shirt, a pair of Levis and a blue T-shirt. These apparently were the defendant's. By reasonable inference one may deduce that the defendant had jettisoned his own pants and put on some pants he found at the apartment. Unfortunately for the defendant, the owner of these pants was a considerably larger man—or at least had a greater girth. These items were wet with perspiration and officers recognized them as

being worn by the suspects when they fled the car. Officer Petersen identified the defendant as the man who fled from him at the foot of the steps. Officer Konieczny identified the defendant as the man he chased from the car and at whom he had shot.

██ Defendant's sole contention on appeal is that there was a violation of his constitutional rights in the pursuit, detention, arrest and the search of Ms. Barns' apartment.

It is rather apparent from the above statement of facts that the exigent circumstances created by the defendant's armed robbery and flight warranted the actions taken by the officers in arresting them. "The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute 'exceptional circumstances' sufficient to justify a search without a warrant." (*People* v. *Smith,* 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Bradford,* 28 Cal.App.3d 695, 702 [104 Cal.Rptr. 852].)

Here, the officers were dealing with a very serious offense—an armed robbery. The pursuit of the car was completely reasonable. The intrusion into Ms. Barns' backyard was completely reasonable. As of that time, the officers knew they were in fresh pursuit of two armed robbery suspects with whom they had been involved in a dangerous high-speed chase. It was noted that the screen door of the apartment had been ripped off its mount. The attention to the television program while all hell was breaking loose outside was a most peculiar circumstance. The officers were thus reasonable in their suspicion that the suspects were hiding in the apartment and possibly endangering the residents of the apartment.

██ Defendant's next attack upon the actions of the officers is that they failed to comply with Penal Code section 844 by knocking, identifying themselves and stating the purpose of their visit. The answer to this is that the defendant and his codefendant were not householders within the concept covered by Penal Code section 844. As this court said in *People* v. *Ortiz,* 276 Cal.App.2d 1 [80 Cal.Rptr. 469], an intruder or a trespasser may not make another man's home his castle for the purposes of the protections set forth in Penal Code section 844. (See *People* v. *Solario,* 19 Cal.3d 760 [139 Cal.Rptr. 725, 566 P.2d 627].) The defendant was not an invited guest in the Barns' apartment, he was a trespasser who was seeking to escape the police. He has no standing to complain about any alleged violation of Penal Code section 844.

Additionally, Ms. Barns, the apparent householder, had, by her actions, invited the officers in. The actions of the officers in entering the apartment were reasonable and in no way violated a y constitutional or statutory rights of the defendant.

We conclude that there was no violation of any constitutional rights of the defendant in his pursuit, detention and arrest.

Judgment affirmed.

Tamura, J., and McDaniel, J., concurred.