107 F.3d 1337
 97 Cal. Daily Op. Serv. 1367, 97 Cal. Daily
Op. Serv. 2638,
97 Daily Journal D.A.R. 2012
Troy Isaiah MITCHELL, Petitioner-Appellant,
v.
K.W. PRUNTY, Chief Deputy Warden, Respondent-Appellee.
 No. 94-55990.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 12, 1996.
Decided Feb. 26, 1997.
As Amended on Denial of Rehearing and Rehearing En Banc
April 10, 1997.*
 
 Daniel H. Bookin, Peter Obstler, O'Melveny & Myers, San Francisco, CA, for petitioner-appellant Mitchell.
 Alene M. Games, Deputy Attorney General, Los Angeles, CA, for respondent-appellee Chief Deputy Warden K.W. Prunty.
 Appeal from the United States District Court for the Central District of California, Richard A. Gadbois, Jr., District Judge, Presiding. D.C. No. CV-93-05796-RG(GHK).
 Before: GOODWIN, PREGERSON and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 The question at the heart of this state habeas case is whether there was sufficient evidence to convict petitioner of aiding and abetting a gang-related murder.
 
 
 2
 * The evening of July 11, 1989, started out uneventfully for members of the Four Tray Hoover Crips gang and their rivals, the Rolling Forties. Between six and seven p.m. Maurice Taylor, Jerry "Judabean" Knox, "Eight-Ball" and "Big Black," all of them Four Tray Hoovers, were hanging out on the corner of 43rd and Kansas Streets in the city of Los Angeles. Things quickly turned ugly, however, when petitioner Troy Isaiah Mitchell, standing on the nearby second-floor landing of his apartment building, yelled out "Fuck Hoover."[1]
 
 
 3
 Taking extreme umbrage, Judabean and his cohorts ran up the staircase from the street to the second-floor landing and kicked in the door to Mitchell's apartment. After a fistfight between gang members, the Hoovers returned to their perch on the street corner. A few minutes later, Mitchell drove by with fellow Rolling Forty members; the group opened fire on the Hoovers. Big Black was shot in the ankle and Judabean in the arm. The former was taken to the hospital while the latter retreated to his aunt's nearby home.
 
 
 4
 Kimberly Johnston, Judabean's girlfriend, learned of the shooting and immediately came to his aid. She intended to drive him to the hospital, she testified, but they never got there. En route, Judabean asked Johnston to stop in front of petitioner's apartment building, the scene of the earlier altercation. There, a group of men stood on the second-floor landing; one of them held a long-barreled gun in plain sight. Judabean rolled down the car window and yelled in an angry voice, "I wish you would shoot me." He then got out of the car and repeated his challenge.
 
 
 5
 This turned out to be a bad idea. When the shooting stopped, Judabean was lying on the ground. One bullet had passed through his neck and lodged in his spine; another had passed through his right leg. Johnston drove off in fear, leaving Judabean in the street.
 
 
 6
 After the second shooting, those on the landing fled. Some ran down the street; others piled into two cars. While speeding away, one car made a U-turn and trampled Judabean's body, crushing his chest. There was testimony that Mitchell was the driver of that car. Mitchell himself told police he was the driver; he later denied driving but seemed to concede he had been in the car.
 
 
 7
 At trial, Dr. Christopher Rogers, a Deputy Medical Examiner, testified that Judabean's three gunshot wounds--one in the arm, another in the right leg and the last in the neck--would have been treatable. He further testified that, but for the blunt force compression of the chest, Judabean would probably have survived with ordinary medical care. Dr. Rogers concluded that the chest injury was "rapidly fatal" and would have caused death within one or two minutes, even if it had been Judabean's only injury.
 
 II
 
 8
 Mitchell alone was charged with Judabean's killing; a jury found him guilty of second degree murder. The verdict form also contained two special jury findings: (1) that Mitchell had not committed the crime by personal use of a firearm; and (2) that he had not committed the crime by driving the vehicle that ran over Judabean.[2]
 
 
 9
 After unsuccessfully pursuing state court remedies, Mitchell filed a federal habeas petition pursuant to 28 U.S.C. § 2254.[3] The district court, adopting the findings, conclusions and recommendations of the magistrate judge, dismissed the petition on the merits and denied a Certificate of Probable Cause.[4] We granted Mitchell's request for a Certificate of Probable Cause.[5]
 
 
 10
 Mitchell argues that there was insufficient evidence to sustain his murder conviction.[6] We review Mitchell's petition de novo. Calderon v. Prunty, 59 F.3d 1005, 1008 (9th Cir.1995). Because the jury found that Mitchell neither fired any of the bullets that struck Judabean nor drove the vehicle that crushed Judabean's chest, he could be guilty of Judabean's murder--if at all--only as an aider and abettor. In California, a person is guilty of aiding and abetting if "he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." People v. Beeman, 35 Cal.3d 547, 561, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984). To be convicted, an aider and abettor must have criminal intent, and "the requisite intent to render such aid must be formed prior to or during 'commission' of that offense." People v. Cooper, 53 Cal.3d 1158, 1164, 282 Cal.Rptr. 450, 811 P.2d 742 (1991)(emphasis in original).
 
 
 11
 Since the jury did not disclose how it thought Mitchell aided and abetted Judabean's murder, we must consider petitioner's involvement in the gang-related activities the night Judabean was killed.
 
 A. The Shootings
 
 12
 Judabean was shot on two separate occasions. The state does not contend that the first shooting caused a lethal injury. The state does take great pains to connect Mitchell to the second shooting; it argues that, even though Mitchell was found not to have fired any of the shots from the balcony, he intentionally promoted the shooting by his fellow gang members. During deliberations, the jury seemed to focus on the possibility that Mitchell aided and abetted by admitting armed gang members onto the landing of his apartment building. It asked the trial judge for
 
 
 13
 [f]urther instruction on the meaning of "to aid and abet." Specifically, is the defendant aiding and abetting in the commission of a crime (murder) or the natural consequence (murder) if he allows or facilitates or promotes the introduction of deadly firearms into his home.
 
 ER at 131. The court responded:
 
 14
 If you find that the defendant let or allowed firearms into his apartment with the intent and mental state as defines murder of the first or second degree, then the answer to your question is yes, which means that if you find that the defendant allowed or let the firearm or firearms into his apartment with the intent to use them in the crime of murder, first- or second-degree murder, then the answer is yes. But if you found that the defendant let or allowed the firearms into his apartment without such intent or mental state, then the answer is no.
 
 ER at 140-41.[7]
 
 15
 The jury instruction is correct; on this record, it also leads to only one possible answer: Because Mitchell could not have known that Judabean would appear outside his apartment--deferring medical care in order to taunt his adversaries--there is no way Mitchell could have admitted fellow gang members into his apartment with the intent to commit murder. Thus, even if Mitchell facilitated Judabean's murder by making the landing of his apartment building available to the assailants,[8] this actus reus was not coupled with the necessary simultaneous mens rea.[9] Evidence that Mitchell may have wanted Judabean dead--that is to say, that he had a motive for murder--is not proof of intent.[10]B. The Car Assault
 
 
 16
 The jury might have rested its verdict on Mitchell's participation in running Judabean over with the car. Because this was the actual cause of Judabean's death, Mitchell could have been found guilty of aiding and abetting if there were proof that he instigated, encouraged or assisted the driver in crushing Judabean with the car. See Beeman, 35 Cal.3d at 561, 199 Cal.Rptr. 60, 674 P.2d 1318. But there is no such evidence. One witness testified that Mitchell drove the car that ran over Judabean but the jury rejected this theory in its special finding: "We further find the defendant, Troy Isaiah Mitchell, was not the driver of the car which drove over Jerry Knox."
 
 
 17
 As to what else Mitchell might have done to abet the running over of Judabean, the record is silent. There is no proof that the vehicle that killed Judabean was owned or provided by Mitchell for the purpose of doing the running over; there is no proof that Mitchell said anything to the driver of the vehicle in the minutes between the shooting and the fatal U-turn; in short, there is nothing at all to suggest that Mitchell helped bring about Judabean's death, except perhaps by adding weight to the car that ran over Judabean's body. There is, in other words, a massive failure of proof that Mitchell aided and abetted Judabean's killing.
 
 
 18
 The state tries hard to bridge the gap in its evidence by arguing that Mitchell aided and abetted the killing by fanning the fires of gang warfare that culminated in Judabean's death. It offers this recitation of facts that, in its view, support the jury's inference of guilt:
 
 
 19
 [T]he other princip[als] were appellant's fellow gang members.... [A]ppellant knew additional crimes would be committed because appellant seemed determine[d] to fuel escalating hostilities. Additionally, [appellant stated that] he got into a ... car ... which ran over Judabean's body.... [Appellant] fled with his fellow gang members, and remained with them throughout the evening, without ever trying to distance himself from the gang or the crime.
 
 
 20
 Appellee's Supplemental Br. at 21-22.
 
 
 21
 The state's argument smacks of guilt by association. Except in West Side Story, gang members do not move in lock-step formation. Gang movements are, in fact, often more chaotic than concerted. See Jeffrey J. Mayer, Individual Moral Responsibility and the Criminalization of Youth Gangs, 28 Wake Forest L.Rev. 943, 949-50 (1993)(describing most gangs as "disorganized" and decrying "efforts to prosecute ... gang members on the basis of social ties," as opposed to "traditional legal principles," as a "panic response"). Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting. To hold otherwise would invite absurd results. Any gang member could be held liable for any other gang member's act at any time so long as the act was predicated on the "common purpose of 'fighting the enemy.' " Curtin v. Lataille, 527 A.2d 1130, 1133 (R.I.1987).[11]
 
 
 22
 Forsaking gang membership as a basis for liability, the state cannot rely on Mitchell's presence at the time of the shooting, or in the assaulting car, to establish liability. That Mitchell may be a thoroughly evil person does not, under California law, make him a murderer.[12]
 
 
 23
 * * *
 
 
 24
 Because there is no evidence from which a rational jury could have inferred that Mitchell aided and abetted Jerry Knox's murder, we REVERSE the district court's denial of the petition for a writ of habeas corpus and REMAND for issuance of the writ.
 
 PREGERSON, Circuit Judge, dissenting:
 
 25
 We are required to "consider[ ] the evidence in a light most favorable to the prosecution and defer[ ] to the trier of fact's presumed resolution of conflicting inferences most favorably to the prosecution." Payne v. Borg, 982 F.2d 335, 339 (9th Cir.1992) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Viewed in this light, the evidence in this case could allow a rational trier of fact to find that Mitchell aided and abetted in the murder of Knox.
 
 THE SHOOTING
 
 26
 The first juncture at which Mitchell could have aided and abetted Knox's murder was when the shooters on Mitchell's landing fired at Knox.
 
 
 27
 In a special verdict, the jury found that Mitchell himself did not fire at Knox. Moreover, mere participation in a gang that is involved in a homicide is an insufficient basis from which to infer a particular gang member's intent to commit the homicide. But here, the record contains other evidence to support a conclusion that Mitchell intentionally aided and abetted the shooting of Knox by permitting heavily-armed fellow gang members to gather just outside Mitchell's apartment before the midnight shooting.
 
 
 28
 First, the record contains facts that could support an inference that killing Knox was a personal priority for Mitchell. Mitchell had a motive to kill Knox because Knox had broken into Mitchell's apartment earlier that evening. Some evidence also indicated that Mitchell and Knox had gotten into a fistfight during Knox's break-in and that Mitchell had wounded Knox in a drive-by shooting soon after the fight.
 
 
 29
 Second, the record indicates that Mitchell's apartment served as headquarters for the day's activities leading up to Knox's murder. In particular, the record indicates that Mitchell's gang gathered at his apartment and was heavily-armed when Knox arrived later that night.
 
 
 30
 Given these facts, a reasonable jury could have concluded that Mitchell intended to aid and abet his fellow gang members in killing Knox if the opportunity presented itself. This circumstantial evidence and the logical inferences drawn from it are sufficient to sustain Mitchell's conviction. See Payne, 982 F.2d at 341 (denying habeas relief to petitioner convicted of intentionally aiding first-degree murder because "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction") (quoting United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir.1986)).
 
 THE ASSAULT WITH THE CAR
 
 31
 The second juncture at which the jury could have found that Mitchell aided and abetted Knox's murder was when Mitchell joined his fellow gang members in a car which, according to some testimony, was the car that drove over Knox's injured body and crushed his chest.
 
 
 32
 In its special verdict, the jury found that Mitchell was not the driver of that car. The special verdict did not determine, however, that Mitchell played no role in this assault. As noted above, there is evidence that could support the inference that Mitchell wanted to kill Knox. There is also some evidence that Mitchell was in the car that ran over Knox. A rational jury could infer from this evidence of Mitchell's presence in the car and his animus toward Knox that Mitchell encouraged the driver of the car to make a sudden U-turn and run over Knox. Thus, the evidence in the record could support a conclusion that Mitchell intentionally aided and abetted Knox's murder by encouraging the assault with the car. See Payne, 982 F.2d at 341 (upholding a conviction where "[a] rational trier of fact could prefer the incriminating explanation for [petitioner's] conduct over explanations which would be inconsistent with an intent to aid in the killing").
 
 JURY INSTRUCTIONS
 
 33
 Mitchell also argues that he was denied due process because the trial court failed to instruct the jury as to intent, an essential element of the offense of aiding and abetting second-degree murder. Because Mitchell did not object to the jury instructions at the time of trial, the instructions are reviewed for plain error. United States v. English, 92 F.3d 909, 914 (9th Cir.1996).
 
 
 34
 Contrary to Mitchell's contention, the record shows that the trial court properly instructed the jury on the element of intent. The trial court issued standard jury instructions taken from California Jury Instructions (Criminal) ("CALJIC") 3.01. CALJIC 3.01, as submitted to the jury, explicitly sets forth intent as an element of aiding and abetting second-degree murder:
 
 
 35
 A person aids and abets the commission of a crime when he or she, (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime.
 
 
 36
 CALJIC 3.01 (emphasis added).
 
 
 37
 The jury later requested further instruction on the meaning of "to aid and abet." The jury asked: "Specifically, is the defendant aiding and abetting in the commission of a crime (murder) or the natural consequence (murder) if he allows and/or facilitates and/or promotes the introduction of deadly firearms into his home?"
 
 
 38
 The trial court responded with a supplemental instruction which clearly reiterated the element of intent:
 
 
 39
 [I]f you found that the defendant allowed or let the firearm or firearms into his apartment with the intent to use them in the crime of murder, first- or second-degree murder, then the answer is yes. But if you found that the defendant let or allowed the firearms into his apartment without such intent or mental state, then the answer is no.
 
 
 40
 Because the trial court clearly indicated intent as an element of the offense in both the original and supplemental jury instructions, there was no plain error.
 
 CONCLUSION
 
 41
 The standard of review in this case does not permit us to grant habeas relief solely because we are unsure whether the petitioner intentionally aided and abetted in the killing. "We are required to deny the writ, even if we ourselves might not be persuaded beyond a reasonable doubt, if any rational trier of fact could have been so persuaded...." Payne, 982 F.2d at 339. I think the circumstantial evidence in this case is sufficient to permit a rational jury to find that Mitchell intentionally aided and abetted in Knox's killing. Accordingly, I would affirm.
 
 
 
 *
 Judge Pregerson would grant the petition for rehearing
 
 
 [1]
 Like Justice Robert Gardner, we deplore the continuing decline in the style and finesse of our public discourse:
 It is a sad commentary on contemporary culture to compare "Don't say a word, don't say a mother-fucking word" with "Stand and deliver," the famous salutation of Dick Turpin and other early English highwaymen. It is true that both salutations lead to robbery. However, there is a certain rich style to "Stand and deliver." On the other hand, "Don't say a word, don't say a mother-fucking word" conveys only dismal vulgarity.
 The speech of the contemporary criminal culture has always been a rich source of color and vitality to any language. Yet, when one compares the "bawds," "strumpets," "trulls," "cut-purses," "knaves," and "rascals" of Fielding and Smollett to the "hookers," "pimps," "Narcs," "junkies," and "snitches" of today's criminal argot, one wonders just which direction we are traveling civilization's ladder. "Hooker," at least, has traceable historical antecedents--although the descendants of General "Fighting Joe" Hooker would probably prefer that their famous ancestor be remembered for something other than his army's camp followers--such as the slaughter at Chancellorsville.
 People v. Benton, 77 Cal.App.3d 322, 324 n. 1, 142 Cal.Rptr. 545 (1978).
 
 
 [2]
 The verdict read:
 We, the jury in the above-entitled action, find the defendant, Troy Isaiah Mitchell, not guilty of the crime of murder in the first degree, a felony, as charged in count one of the information.
 We, the jury in the above entitled action, find the defendant, Troy Isaiah Mitchell, guilty of the crime of murder in the second degree, a lesser but necessarily included offense to that charged in count one of the information.
 We further find that ... the allegation that in the commission and attempted commission of above offense the said defendant, Troy Isaiah Mitchell, personally used a firearm within the meaning of Penal Code Section[s] 1203.06(a)(1) and 12022.5 to be not true.
 We further find the defendant, Troy Isaiah Mitchell, was not the driver of the car which drove over Jerry Knox.
 RT 637.
 In its petition for rehearing, the state for the first time urges us to ignore these findings in determining whether the evidence presented at trial was sufficient to convict. It states: "[I]t is ... possible the jury was convinced of petitioner's guilt as a direct perpetrator ... even though they did not find petitioner personally used a firearm, and found he was not the driver of the car." Petition for Rehearing at 7. After all, the government explains, "seemingly inconsistent verdicts do not indicate the prosecutor failed to prove all the essential elements of the offense." Id.
 In support of its argument, the state points to United States v. Powell, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); United States v. Shenberg, 89 F.3d 1461 (11th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997); and United States v. McKinney, 88 F.3d 551 (8th Cir.1996). But these cases stand for an altogether different proposition: that in reviewing the sufficiency of the evidence on one count, acquittals on other, related counts, are not conclusive. See Powell, 469 U.S. at 67, 105 S.Ct. at 478 ("Sufficiency-of-the-evidence review ... should be independent of the jury's determination that evidence on another count was insufficient."); Shenberg, 89 F.3d at 1470 ("[N]either the acquittal of appellants nor their codefendants on other counts alleging similar or related conduct is relevant to the issue of whether sufficient evidence supports appellants' RICO conspiracy convictions."); McKinney, 88 F.3d at 555 ("Appellate review of a conviction on one count ... takes place independent of the jury's determination that evidence on another count was insufficient." (internal quotation omitted)). This is true as a simple logical matter; an acquittal is not proof of any predicate fact.
 Special findings, by contrast, are dispositive of the questions put to the jury. Having agreed to the questions, the government cannot now ask us to ignore the answers; to do so would be a clear violation of petitioner's Sixth Amendment rights.
 
 
 [3]
 The state argues that the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, signed into law on April 24, 1996, bars consideration of Mitchell's petition. However, we have held that the statute is not to be applied to cases pending at the time it was enacted. Order, Jeffries v. Wood, 103 F.3d 827 (9th Cir.1996)("We hold that the amendments to Chapter 153 of Title 28 of the United States Code contained in Title I of the Act do not apply to cases filed in federal courts of this Circuit prior to the Act's effective date of April 24, 1996.")
 In any event, the Act does not prevent review where the state court's resolution of petitioner's claim amounts to "an unreasonable application of ... clearly established Federal Law." 28 U.S.C. § 2254(d)(1). Here, the relevant federal law is clearly established; sufficiency of the evidence is evaluated under the standard set forth in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under Jackson, the court must ask, "after viewing the evidence in the light most favorable to the prosecution, [whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (emphasis in original).
 Was the state court's application of Jackson to the facts of this case reasonable? While the contours of the "unreasonable application" standard are still being debated, compare Lindh v. Murphy, 96 F.3d 856, 870-71 (7th Cir.1996), cert. granted, --- U.S. ----, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997), with Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), one factor we must consider in determining whether a state court's application of established law was reasonable is the importance of the issue on review. Because "[t]he question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence," Jackson, 443 U.S. at 323, 99 S.Ct. at 2791, state courts must take more than a perfunctory look at the relationship between the evidence presented and the verdict.
 Here, the California Court of Appeal, devoting just over one page to Mitchell's sufficiency claim, failed to do the issue justice. Much of the discussion focuses on a neighbor's testimony that Mitchell "got into the car [and] started the car very quickly and ... made a turn ... and ran ... over [Judabean]." People v. Mitchell, No. B056366, at 6 (Cal. Ct.App. filed Nov. 25, 1992). But this testimony was mooted by the jury's finding that Mitchell was not driving the car. See note 2 supra. It is not reasonable to affirm a conviction based on testimony that is clearly rejected by the verdict. The court also relied on the statement of Maurice Taylor that Mitchell shot Judabean in the arm; the testimony of Judabean's girlfriend that a group of people on the balcony near Mitchell's apartment shot Judabean; and "the physical evidence of 17 shell casings found on [the] staircase of [Mitchell's] apartment." Id. at 6-7. However, the jury found that Mitchell was not a trigger man and, for the reasons explained below, the other facts cited do not come close to proving aiding and abetting. This analysis is also not a reasonable application of Jackson.
 
 
 [4]
 Mitchell v. Prunty, No. CV 93-5796-RG(GHK) (C.D.Cal. filed May 4, 1994)
 
 
 [5]
 Mitchell v. Prunty, No. 94-55990 (9th Cir. Aug.29, 1994) (order granting certificate of probable cause)
 
 
 [6]
 Mitchell also argues that he was deprived of due process when the jury was improperly instructed as to each element of aiding and abetting. Because we vacate the conviction based on insufficiency of the evidence, we do not reach this claim
 
 
 [7]
 The court then referred the jury to its original instructions on aiding and abetting. After more than three days of deliberation, the jury came back with a verdict within ninety minutes of receiving this instruction
 
 
 [8]
 This, too, is doubtful because the undisputed evidence is that Judabean did not die from any of the gunshot wounds. The state's own proof shows that all of Judabean's bullet wounds were treatable, and that he would easily have survived with ordinary medical care. The Deputy Medical Examiner did testify that, had Judabean's injuries been left untreated, he would have died of infections or other complications in a matter of days or weeks. But this is true of many wounds. An injury that could be fatal under highly unusual circumstances cannot be said to have caused the death of a victim who suffered a second, far more traumatic injury, which alone would have caused death in a matter of minutes
 To convict appellant of murder because he inflicted a wound that could have been fatal subverts the general rule that causation is interrupted by an unforeseeable event. Professor Focht described a case in which "the defendant wounded the deceased and the latter died of scarlet fever contracted from the physician who treated the wound. It was held that proximate causation was lacking, because the disease, while the de facto result of the wound, was unforeseeable." James L. Focht, Jr., Proximate Cause in the Law of Homicide--With Special Reference to California Cases, 12 S. Cal. L.Rev. 19, 31-32 (1938)(citing Bush v. Commonwealth, 78 Ky. 268 (1880)). The failure to properly treat a serious but nonfatal wound is at least as unforeseeable in the 1990s as was the transmission of scarlet fever in the 1880s.
 Put another way, if "gross maltreatment of the wound was the sole cause of death, the person inflicting the wound will not be liable ..., because the wound was not the proximate cause of death." Focht, 12 S.Cal.L.Rev. at 34. In this case, "gross maltreatment" would have been required to render Judabean's gunshot wounds fatal.
 
 
 [9]
 Although second degree murder does not involve premeditation, aiding and abetting second degree murder does require intent to facilitate a criminal act. That act may be a lesser crime than second degree murder because, "Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime ... but also for any other offense ... committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." People v. Prettyman, 58 Cal.Rptr.2d 827, 926 P.2d 1013 (1996); see also People v. Montano, 96 Cal.App.3d 221, 226, 158 Cal.Rptr. 47 (1979) (where a defendant knowingly and intentionally aids a criminal act, he is liable for all crimes that are a natural and probable consequence of that act)
 However, as discussed above, there is no evidence that Mitchell intentionally aided and abetted second degree murder or any other crime (such as assault) of which second degree murder was a natural and probable result.
 
 
 [10]
 Mitchell might also have been guilty as an aider and abettor had he formed the requisite intent, and begun assisting the assailants, before the gunfight had ended. Cf. People v. Montoya, 7 Cal.4th 1027, 1048, 31 Cal.Rptr.2d 128, 874 P.2d 903 (1994). However, the record contains no evidence that he rendered any assistance other than letting the assailants into his apartment building
 
 
 [11]
 Indeed, accepting the state's argument, we fail to see why any other member of defendant's gang could not be held criminally liable for Judabean's death, since they all "remained with [each other] throughout the evening, without ever trying to distance [themselves] from the gang or the crime."
 
 
 [12]
 The weakness of the government's case is illustrated by this passage from its brief:
 It was undisputed at trial that Judabean had engaged in a number of fights at appellant's apartment on the day of the shooting. Nor was it disputed that appellant and Judabean belonged to rival gangs. Finally, the evidence was uncontradicted Judabean had been shot, driven over by a car, and he died from those wounds. Appellant's sole defense was he was not the perpetrator of the murder nor did he aid and abet in the murder.
 Appellee's Br. at 10.
 This "sole defense" also happens to be a claim of innocence.