KOZINSKI, Circuit Judge.
The question at the heart of this state habeas ease is whether there was sufficient evidence to convict petitioner of aiding and abetting a gang-related murder.
I
The evening of July 11, 1989, started out uneventfully for members of the Four Tray Hoover Crips gang and their rivals, the Rolling Forties. Between six and seven p.m. Maurice Taylor, Jerry “Judabean” Knox, “Eight-Ball” and “Big Black,” all of them Four Tray Hoovers, were hanging out on the corner of 43rd and Kansas Streets in the city of Los Angeles. Things quickly turned ugly, however, when petitioner Troy Isaiah Mitchell, standing on the nearby second-floor landing of his apartment building, yelled out “Fuck Hoover.”[1]
Taking extreme umbrage, Judabean and his cohorts ran up the staircase from the street to the second-floor landing and kicked in the door to Mitchell’s apartment. After a fistfight between gang members, the Hoovers returned to their perch on the street comer. A few minutes later, Mitchell drove by with fellow Rolling Forty members; the group opened fire on the Hoovers. Big Black was shot in the ankle and Judabean in the arm. The former was taken to the hospital while the latter retreated to his aunt’s nearby home.
Kimberly Johnston, Judabean’s girlfriend, learned of the shooting and immediately came to his aid. She intended to drive him to the hospital, she testified, but they never got there. En route, Judabean asked Johnston to stop in front of petitioner’s apartment building, the scene of the earlier altercation. There, a group of men stood on the second-floor landing; one of them held a long-barreled gun in plain sight. Judabean rolled down the car window and yelled in an angry voice, “I wish you would shoot me.” He then got out of the car and repeated his challenge.
This turned out to be a bad idea. When the shooting stopped, Judabean was lying on the ground. One bullet had passed through his neck and lodged in his spine; another had passed through his right leg. Johnston *-245 drove off in fear, leaving Judabean in the street.
After the second shooting, those on the landing fled. Some ran down the street; others piled into two cars. While speeding away, one car made a U-turn and trampled Judabean’s body, crushing his chest. There was testimony that Mitchell was the driver of that ear. Mitchell himself told police he was the driver; he later denied driving but seemed to concede he had been in the car.
At trial, Dr. Christopher Rogers, a Deputy Medical Examiner, testified that Judabearis three gunshot wounds — one in the arm, another in the right leg and the last in the neck — would have been treatable. He further testified that, but for the blunt force compression of the chest, Judabean would probably have survived with ordinary medical care. Dr. Rogers concluded that the chest injury was “rapidly fatal” and would have caused death within one or two minutes, even if it had been Judabean’s only injury.
II
Mitchell alone was charged with Judabean’s killing; a jury found him guilty of second degree murder. The verdict form also contained two special jury findings: (1) that Mitchell had not committed-the crime by personal use of a- firearm; and (2) that he had not committed the crime by driving the vehicle that ran over Judabean.[2]
After unsuccessfully pursuing state court remedies, Mitchell filed a federal habeas petition pursuant to 28 U.S.C. § 2254.[3] *-244 The district court, adopting the findings, conclusions and recommendations of the magistrate judge, dismissed the petition on the merits and denied a Certificate of Probable Cause.[4] We granted Mitchell's request for a Certificate of Probable Cause.[5]
Mitchell argues that there was insufficient evidence to sustain his murder conviction.[6] We review Mitchell's petition de ■novo. Calderon v. Prunty, 59 F.3d 1005, 1008 (9th Cir.1995). Because the jury found that Mitchell neither fired any of the bullets that struck Judabean- nor drove the vehicle that crushed Judabean’s chest, he could be guilty of Judabean’s murder — if at all — only as an aider and abettor. In California, a person is guilty of aiding and abetting if “he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.” People v. Beeman, 35 Cal.3d 547, 561, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984). To be convicted, an aider and abettor must have criminal intent, and “the requisite intent to render such aid must be formed prior to or during ‘commission’ of that offense.” People v. Cooper, 53 Cal.3d 1158, 1164, 282 Cal.Rptr. 450, 811 P.2d 742 (1991)(emphasis in original).
Since the jury did not disclose how it thought Mitchell aided and abetted Judabe-an’s murder, wé must consider petitioner’s involvement in the gang-related activities the night Judabean was killed.
A. The Shootings
Judabean was shot on two separate occasions. The state does not contend that the first shooting caused a lethal injury. The state does take great pains to connect Mitchell to the second shooting; it argues that, even though Mitchell was found not to have fired any of the shots from the balcony, he intentionally promoted the shooting by his fellow gang members. During deliberations, the jury seemed to focus on the possibility *-243 that Mitchell aided and abetted by admitting armed gang members onto the -landing of his apartment building. It asked the trial judge for
[fjurther instruction on the meaning of “to aid and abet.” Specifically, is the defendant aiding and abetting in the commission of a crime (murder) or the natural consequence (murder) if he allows or facilitates or promotes the introduction of deadly firearms into his home.
ER at 131. The court responded:
If you find that the defendant let or allowed firearms into his apartment with the intent and mental state as defines murder of the first or second degree, then the answer to your question is yes, which means that if you find that the defendant allowed or let the firearm or firearms into his apartment with the intent to use them in the crime of murder, first- or second-degree murder, then the answer is yes. But if you found that the defendant let or allowed the firearms into his apartment without such intent or mental state, then the answer is no.
ER at 140-41.[7]
The jury instruction is correct; on this record, it also leads to only one possible answer: . Because Mitchell could not have known that Judabean- would appear outside his apartment — deferring medical care in order to taunt his adversaries — there is no way Mitchell could have admitted fellow gang members into his apartment with the intent to commit murder. Thus, even if Mitchell facilitated Judabean’s murder by making the landing of his apartment budding available to the assailants,[8] this actus reus was not coupled with the necessary simultaneous mens rea.[9] Evidence that Mitchell may have wanted Judabean dead — that is to say, that he had a motive for murder — is not proof of intent.[10]
*-242 B. The Car Assault
The jury might have rested its verdict on Mitchell’s participation in running Judabe-an over with the car. Because this was the actual cause of Judabean’s death, Mitchell could have been found guilty of aiding and abetting if there were proof that he instigated, encouraged or assisted the driver in crushing Judabean with the car. See Beeman, 35 Cal.3d at 561, 199 Cal.Rptr. 60, 674 P.2d 1318. But there is no such evidence. One witness testified that Mitchell drove the car that ran over Judabean but the jury rejected this theory in its special finding: “We further find the defendant, Troy Isaiah Mitchell, was not the driver of the car which drove over Jerry Knox.”
As to what else Mitchell might have done to abet the running over of Judabean, the record is silent. There is no proof that the vehicle that killed Judabean was owned or provided by Mitchell for the purpose of doing the running over; there is no proof that Mitchell said anything to the driver of the .vehicle in the minutes between the shooting and the fatal U-tum; in short, there is nothing at all to suggest that Mitchell' helped bring about Judabean’s death, except perhaps by adding weight to the car that ran over Judabean’s body. There is, in other words, a massive failure of proof that Mitchell aided and abetted Judabean’s killing.
The state tries hard to bridge the gap in its evidence by arguing that Mitchell aided and abetted the killing by fanning the fires of gang warfare that culminated in Judabean’s death. It offers this recitation of facts that, in its view, support the jury’s inference of guilt:
[T]he other principiáis] were appellant’s fellow gang members.... [AJppellant knew additional crimes would be committed because appellant seemed determine[d] to fuel escalating hostilities. Additionally, [appellant stated that] he got into a ... car ... which ran over Judabean’s body_ [Appellant] fled with his fellow gang members, and remained with them throughout the evening, without ever trying to distance himself from the gang or the crime.
Appellee’s Supplemental Br. at 21-22.
The state’s argument smacks of guilt by association. Except in West Side Story, gang members do not move in lock-step formation. Gang movements are, in fact, often more chaotic than concerted. See Jeffrey J. Mayer, Individual Moral Responsibility and the Criminalization of Youth Gangs, 28 Wake Forest L.Rev. 943, 949-50 (1993)(deseribing most gangs as “disorganized” and decrying “efforts .to prosecute ... gang members on the basis of social ties,” as opposed to “traditional legal principles,” as a “panic response”). Membership in a gang cannot serve as proof of intent, or of the facilitation, advice, aid, promotion, encouragement or instigation needed to establish aiding and abetting. To hold otherwise would invite absurd results. Any gang member could be held liable for any other gang member’s act at any time so long as the act was predicated on the “common purpose of ‘fighting the enemy.’ ” Curtin v. Lataille, 527 A.2d 1130, 1133 (R.I.1987).[11]
Forsaking gang membership as a basis for liability, the state cannot rely on Mitchell’s presence at the time of the shooting, or in the assaulting car, to establish liability. That Mitchell may be a thoroughly evil person does not, under California law, make him a murderer.[12]
Because there is no evidence from which a rational jury could have inferred that Mitchell aided and abetted Jerry Knox’s murder, we REVERSE the district court’s denial of *-241 the petition for a writ of habeas corpus and REMAND for issuance of the writ.

. Like Justice Robert Gardner, we deplore the continuing decline in the style and finesse of our public discourse:
It is a sad commentary on contemporary culture to compare "Don’t say a word, don’t say a mother-fucking word” with "Stand and deliver," the famous salutation of Dick Turpin and other early English highwaymen. It is true that both salutations lead to robbery. However, there is a certain rich style to "Stand and deliver." On the other hand, “Don’t say a word, don’t say a mother-fucking word" conveys only dismal vulgarity.
The speech of the contemporary criminal culture has always been a rich source of color and vitality to any' language. Yet, when one compares the “bawds,” "strumpets," "trulls," “cut-purses,” “knaves," and "rascals” of Fielding and Smollett to the "hookers,” "pimps," "Nares,” "junkies,” and "snitches” of today's criminal argot, one wonders just which direction we are traveling civilization's ladder. "Hooker,” at least, has traceable historical antecedents — although the descendants of General "Fighting Joe” Hooker would probably prefer that their famous ancestor be remembered for something other than his army's camp followers — such as the slaughter at Chancellorsville.
People v. Benton, 77 Cal.App.3d 322, 324 n. 1, 142 Cal.Rptr. 545 (1978).F

. The verdict read:
We, the jury in the above-entitled action, find the defendant, Troy Isaiah Mitchell, not guilty of the crime of murder in the first degree, a felony, as charged in count one of the information.
We, the jury in the above entitled action, find the defendant, Troy Isaiah Mitchell, guihy of the crime of murder in the second degree, a lesser but necessarily included offense to that charged in count one of the information.
We further find that ... the allegation that in the commission and attempted commission of above offense the said defendant, Troy Isaiah Mitchell, personally used a firearm within the meaning of Penal Code Sectionfs] 1203.06(a)(1) and 12022.5 to be not true.
We further find the defendant, Troy Isaiah Mitchell, was not the driver of the car which drove over Jerry Knox.
RT 637.
In its petition for rehearing, the state for the first time urges us to ignore these findings in determining whether the evidence presented at trial was sufficient to convict. It states: "[I]t is ... possible the jury was convinced of petitioner’s guilt as a direct perpetrator ... even though they did not find petitioner personally used a firearm, and found he was not the driver of the car.” Petition for Rehearing at 7. After all, the government explains, "seemingly inconsistent verdicts do not indicate the prosecutor failed to prove all the essential elements of the offense.” Id.
In support of its argument, the state points to United States v. Powell, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); United States v. Shenberg, 89 F.3d 1461 (11th Cir.1996), cert. denied, — U.S.—, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997); and United States v. McKinney, 88 F.3d 551 (8th Cir.1996). But these cases stand for an altogether different proposition: that in reviewing the sufficiency of the evidence on one count, acquittals on other, related counts, are not conclusive. See Powell, 469 U.S. at 67, 105 S.Ct. at 478 ("Sufficiency-of-the-evidence review ... should be independent of the juiy’s determination that evidence on another count was insufficient.”); Shenberg, 89 F.3d at 1470 ("[Njeither the acquittal of appellants nor their codefendants on other counts alleging similar or related conduct is relevant to the issue of whether sufficient evidence supports appellants’ RICO conspiracy convictions.”); McKinney, 88 F.3d at 555 (“Appellate review of a conviction on one count ... takes place independent of the jury’s determination that evidence on another count was insufficient.” (internal quotation omitted)). This is true as a simple logical matter; an acquittal is not proof of any predicate fact.
Special findings, by contrast, are dispositive of the questions put to the jury. Having agreed to the questions, the government cannot now ask us to ignore the answers; to do so would be a' clear violation of petitioner's Sixth Amendment rights.

. The state argues that the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, signed into law on April 24, 1996, bars consideration of Mitchell’s petition. However, we have held that the statute is not to be applied to cases pending at the time it was enacted. Order, Jeffries v. Wood, 103 F.3d 827 (9th Cir.1996)("We hold that the amendments to Chapter 153 of Title 28 of the United States Code contained in Title I of the Act do not apply to cases filed in federal courts of this Circuit prior to the Act's effective date of April 24, 1996.”).
*-244 In any event, the Act does not prevent review where the state court's resolution of petitioner's claim, amounts to "an unreasonable application of ... clearly established Federal Law.” 28 U.S.C. § 2254(d)(1). Here, the relevant federal law is clearly established; sufficiency of the evidence is evaluated under the standard set forth in. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under Jackson, the court must ask, "after viewing the- evidence in the light most favorable to the prosecution,' [whether] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (emphasis in original).
Was the state court’s application of Jackson to the facts of this case reasonable? While the contours of the "unreasonable application” standard are still being debated, compare Lindh v. Murphy, 96 F.3d 856, 870-71 (7th Cir.1996), cert. granted, — U.S. —, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997), with Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), one factor we must consider in determining whether a state court's application of established law was reasonable is the importance of the issue on review. Because "[t]he question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence,” Jackson, 443 U.S. at 323, 99 S.Ct. at 2791, state courts must take more than a perfunctory look at the relationship between the evidence presented and the verdict.
Here, the California Court of Appeal, devoting just over one page to Mitchell's sufficiency claim, failed to do the issue justice. Much of the discussion focuses on a neighbor’s testimony that Mitchell "got into the car [and] started the car very quickly and ... made a turn ... and ran ... over [Judabean].” People v. Mitchell, No. B056366, at 6 (Cal.Ct.App. filed Nov. 25, 1992). But this testimony was mooted by the jury's finding that Mitchell was not driving the car. See note 2 supra. It is not reasonable to affirm a conviction based on testimony that is clearly rejected by the verdict. The court also relied on the statement of Maurice Taylor that Mitchell shot Judabean in the arm; the testimony of Juda-bean’s girlfriend that a group of people on the balcony near Mitchell's apartment shot Judabe-an; and "the physical evidence of 17 shell casings found on [the] staircase of [Mitchell's] apartment.” Id. at 6-7. However, the jury found that Mitchell was not a trigger man and, for the reasons explained below, the other facts cited do not come close to proving aiding and abetting. This analysis is also not a reasonable application of Jackson.

. Mitchell v. Prunty, No. CV 93-5796-RG(GHK) (C.D.Cal. filed May 4, 1994).

. Mitchell v. Prunty, No. 94-55990 (9th Cir. Aug.29, 1994) (order granting certificate of probable cause).

. Mitchell also argues that he was deprived of due process when the jury was improperly instructed as to each element of aiding and abetting. Because we vacate the conviction based on insufficiency of the evidence, we do not reach this claim.

. The court then referred the juiy to its original instructions on aiding and abetting. After more than three days of deliberation, the juiy came back with a verdict within ninety minutes of receiving this instruction.

. This, too, is doubtful because the undisputed evidence is that Judabean did not die from any of the gunshot wounds. The state’s own proof shows that all of 'Judabean’s bullet wounds were treatable, and that he would easily have survived with ordinary medical care. The Deputy Medical Examiner did testify that, had Judabean’s injuries been left untreated, he would have died of infections or other complications in a matter of days or weeks. But this is true of many wounds. An injury that could be fatal under highly unusual circumstances cannot be said to have caused the death of a victim who suffered a second, far more traumatic injuiy, which alone would have caused death in a matter of minutes.
To convict appellant of murder because he inflicted a wound that could have been fatal subverts the general rule that causation is interrupted by an unforeseeable event. Professor Focht described a case in which "the defendant wounded the deceased and the latter died of scarlet fever contracted from the physician who treated the wound. It was held that proximate causation was lacking, because the disease, while the de facto result of the wound, was unforeseeable.” James L. Focht, Jr., Proximate Cause in the Law of Homicide — With Special Reference to California Cases, 12 S. Cal. L.Rev. 19, 31-32 (1938)(citing Bush v. Commonwealth, 78 Ky. 268 (1880)). The failure to properly treat a serious but nonfatal wound is at least as unforeseeable in the 1990s as was the transmission of scarlet fever in the 1880s.
Put another way, if "gross maltreatment of the wound was the sole cause of death, the person inflicting the wound will not be liable ..., because the wound was not the proximate cause of death.” Focht, 12 S.Cal.L.Rev. at 34. In this case, "gross maltreatment” would have been required to render Judabean’s gunshot wounds fatal.

. Although second degree murder does not involve premeditation, aiding and abetting second degree murder does require intent to facilitate a criminal act. That act may be a lesser crime than second degree murder because, "Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime ... but also for any other offense ... committed by the confederate as a 'natural and probable consequence’ of the crime originally aided and abetted.” People v. Prettyman, 58 Cal.Rptr.2d 827, 926 P.2d 1013 (1996); see also People v. Montano, 96 Cal. App.3d 221, 226, 158 Cal.Rptr. 47 (1979) (where a defendant .knowingly and. intentionally aids a criminal act, he is liable for all crimes that are a natural and probable consequence of that act). However, as discussed above, there is no evidence that Mitchell intentionally aided and abetted second degree murder or any other crime (such as assault) of which second degree murder was a natural and probable result.

. Mitchell might also have been guilty as an aider and abettor had he formed the requisite intent, and begun assisting the assailants, before the gunfight had ended. Cf. People v. Montoya, 7 Cal.4th 1027, 1048, 31 Cal.Rptr.2d 128, 874 P.2d 903 (1994). However, the record contains no evidence that he rendered any assistance other than letting the assailants into his apartment building.

. Indeed, accepting the state’s argument, we fail to see why any other member of defendant's gang could not be held criminally liable for Juda-bean’s death, since they all "remained with [each other] throughout the evening, without ever trying to distance [themselves] from the gang or the crime.”

. The weakness of the government’s case is illustrated by this passage from its brief:
It was undisputed at trial that Judabean had engaged in a number of fights at appellant's apartment on the day of the shooting. Nor was it disputed that appellant and Judabean belonged to rival gangs. Finally, the evidence was uncontradicted Judabean had been shot, driven over by a car, and he died from those wounds. Appellant's sole defense was he was not the perpetrator of the murder nor did he aid and abet in the murder.
Appellee's Br. at 10.
This "sole defense” also happens to be a claim of innocence.